**Reversed and Rendered and Majority and Dissenting Opinions filed April 24, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-11-00045-CV

---

## PRESTON RESERVE, L.L.C., ARTHUR A. LANCASTER, JR., LACY C. HOWE & ROBERT S. PEEK, JR., Appellants

### V.

## COMPASS BANK, Appellee

---

### On Appeal from the 189th District Court
### Harris County, Texas
### Trial Court Cause No. 2009-48427

---

## M A J O R I T Y   O P I N I O N

This is a suit to recover a deficiency remaining after a foreclosure sale of land securing a promissory note. Preston Reserve, L.L.C., Arthur A. Lancaster, Jr., Lacy C. Howe, and Robert S. Peek, Jr. ("Borrowers") appeal a judgment in favor of Compass Bank, contending that the trial court (1) erred by concluding that there was a deficiency after a foreclosure sale because there was no legally sufficient evidence to support a fair market value finding of less than $2.7 million; and (2) should have entered a take nothing judgment against Compass Bank. We reverse the trial court's deficiency judgment and

render a take nothing judgment against Compass Bank.

## Background

Compass Bank loaned $2.4 million to Preston Reserve LLC on January 31, 2008, evidenced by a promissory note. The promissory note was guaranteed by Lancaster, Howe, and Peek, and secured by a deed of trust on a 12.75 acre tract of land located in Frisco, Texas.

Preston Reserve bought the 12.75 acre tract in February 2008 for $3.2 million to construct an apartment complex. Compass Bank then committed to loaning Preston Reserve $22 million to build an apartment complex. Preston Reserve worked on getting engineering and architectural plans and obtained all permits to move forward with construction. In May 2008 — before Preston Reserve received all final permits — Compass Bank modified its loan commitment and agreed to loan Preston Reserve 15 percent less than originally committed. Preston Reserve put its building plans on hold; obtained an extension on the $2.4 million loan; and attempted to raise additional money.

Preston Reserve could not raise enough money to go forward with construction and defaulted on the $2.4 million loan on November 30, 2008. Compass Bank, through "loan workout officer" Carl Scott, started working with Preston Reserve's three guarantors in October 2008 to salvage the loan. After a few months, Scott decided the loan no longer was salvageable. The property was sold at a foreclosure sale on May 5, 2009. Compass Bank, the sole bidder at the foreclosure sale, bought the property for $1.2 million.

Compass Bank sued the Borrowers on July 30, 2009 to recover a deficiency of $1,242,153.85 that remained after the foreclosure sale, plus accrued interest of $87,018.79. The Borrowers answered and challenged the deficiency; they also filed a motion pursuant to Texas Property Code Section 51.003 requesting that the trial court determine the fair market value of the property as of the date of foreclosure.

A bench trial was held on November 11, 2010. Scott testified on behalf of

2

Compass Bank that the property's fair market value at the time of the foreclosure sale was $1 million. Howe testified as a timely designated property valuation expert on behalf of the Borrowers; according to Howe, the property's value was between $2.7 and 2.8 million at the time of the foreclosure sale. After trial, Compass Bank and the Borrowers filed motions for entry of judgment. The trial court signed a final judgment on December 9, 2010, finding that the fair market value of the property was $2.4 million on May 5, 2009, and that the Borrowers, jointly and severally, owed Compass Bank a deficiency of $129,172.64 and attorney's fees. The Borrowers timely appealed.

## Analysis

The Borrowers raise two issues on appeal. First, they argue that no deficiency existed because "there was no legally sufficient evidence to support the trial court's finding of a fair market value as of May 5, 2009, of less than $2,700,000." Second, they contend that, because there is legally insufficient evidence to support a finding that "the fair market value of the 12.75 acre tract on May 5, 2009, was less than $2,700,000, the trial court should have entered a judgment that Compass Bank take nothing."

### I.      Standard of Review and Applicable Law

The Borrowers and Compass Bank did not request findings of fact or conclusions of law pursuant to Texas Rule of Civil Procedure 296, and the trial court filed none. When no findings of fact or conclusions of law are filed or requested in a bench trial, it is implied that the trial court made all necessary findings to support its judgment. *Mays v. Pierce*, 203 S.W.3d 564, 571 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). We must affirm the trial court's judgment on any legal theory that finds support in the evidence. *Treadway v. Shanks*, 110 S.W.3d 1, 5 (Tex. App.—Dallas 2000), *aff'd*, 110 S.W.3d 444 (Tex. 2003). A party's failure to request findings of fact or conclusions of law does not waive his right to challenge the legal sufficiency of the evidence on appeal. *See* Tex. R. App. P. 33.1(d); *Pruet v. Coastal States Trading, Inc.*, 715 S.W.2d 702, 704 (Tex. App.—Houston [1st Dist.] 1986, no writ).

3

When conducting a legal sufficiency review, we credit favorable evidence if a reasonable factfinder could do so and disregard contrary evidence unless a reasonable factfinder could not do so. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *Id.* at 822. The factfinder is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819. We sustain a legal insufficiency challenge only if: (1) the record reveals a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810; *Niche Oilfield Servs., LLC v. Carter*, 331 S.W.3d 563, 569 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

Opinion testimony, even when uncontroverted, does not necessarily bind the trier of fact. "[T]he judgments and inferences of experts or skilled witnesses, even when uncontroverted, are not conclusive on the jury or trier of fact, unless the subject is one for experts or skilled witnesses alone, where the [trier of fact] cannot properly be assumed to have or be able to form correct opinions of their own based upon evidence as a whole and aided by their own experience and knowledge of the subject of inquiry.'" *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 338 (Tex. 1998) (quoting *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986)).

As trier of fact, a trial court is not bound by the testimony of an interested witness merely because it is uncontradicted. *Ex parte Rosser*, 899 S.W.2d 382, 386 (Tex. App.—Houston [14th Dist.] 1995, no writ). Instead, testimony by an interested witness may establish a fact as a matter of law only if the testimony could readily be contradicted if untrue, and is clear, direct and positive, and there are no circumstances tending to discredit or impeach it. *Lofton v. Tex. Brine Corp.*, 777 S.W.2d 384, 386 (Tex. 1989). The trier of fact has several alternatives available when presented with conflicting evidence. *McGalliard*, 722 S.W.2d at 697. It may believe one witness and disbelieve

others. *Id.* It may resolve inconsistencies in the testimony of any witness. *Id.*

Texas Property Code Section 51.003 provides that if the price at which real property is sold at a foreclosure sale is less than the unpaid balance of the indebtedness secured by the real property, resulting in a deficiency, then an action to recover the deficiency can be brought. Tex. Prop. Code Ann. § 51.003(a) (Vernon 2010). "Any person against whom such a recovery is sought by motion may request that the court in which the action is pending determine the fair market value of the real property as of the date of the foreclosure sale." *Id.* § 51.003(b).

"The fair market value shall be determined by the finder of fact after the introduction by the parties of competent evidence of the value." *Id.* Competent evidence of value may include, but is not limited to: (1) expert opinion testimony; (2) comparable sales; (3) anticipated marketing time and holding costs; (4) cost of sale; and (5) the necessity and amount of any discount to be applied to the future sales price or the cash flow generated by the property to arrive at a current fair market value. *Id.*

If the court determines that the fair market value is greater than the sale price of the real property at the foreclosure sale, then the persons against whom recovery of the deficiency is sought are entitled to an offset against the deficiency in the amount by which the fair market value exceeds the sale price. *Id.* § 51.003(c).

Under Texas law, "fair market value" is defined as "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 246 (Tex. 1981).

## II. Fair Market Value and Deficiency

In their first issue, the Borrowers argue that "there was no legally sufficient evidence to support the trial court's finding of a fair market value as of May 5, 2009, of less than $2,700,000." Therefore, the Borrowers contend that the finding of a deficiency was erroneous.

## A.     Property Owner Rule

We first address the Borrowers' challenge to opinion testimony from Compass Bank officer Scott, who opined that the property's value was $1 million at the time of the foreclosure sale. The Borrowers contend that this testimony is not probative evidence of fair market value because Scott was neither an expert nor qualified to testify under the Property Owner Rule. *See Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 847-48 (Tex. 2011); *Porras v. Craig*, 675 S.W.2d 503 (Tex. 1984). The Borrowers contend that "Scott was not competent to testify" as to the value of the land under the Property Owner Rule (1) "either by his position or his personal knowledge;" and (2) because Compass Bank did not own the land at the time of the foreclosure sale.[1]

A property owner generally is qualified to testify about the value of his own property even if he is not an expert and would not be qualified to testify about the value of property owned by others. *Porras*, 675 S.W.2d at 504. This rule is based on the presumption that an owner will be familiar with his own property and know its value. *Speedy Stop*, 337 S.W.3d at 853.

The Property Owner Rule applies to corporate entities; organizations are treated "the same as natural persons for purposes of the Property Owner Rule, with certain restrictions on whose testimony can be considered as that of the property owner." *Id*. at 849. The "Property Owner Rule is limited to those witnesses who are officers of the entity in managerial positions with duties related to the property, or employees of the entity with substantially equivalent positions and duties." *Id*. "Further, the Property Owner Rule falls within the ambit of Texas Rule of Evidence 701 and therefore does not relieve the owner of the requirement that a witness must be personally familiar with the property and its fair market value, but the Property Owner Rule creates a presumption as

---

[1] Compass Bank acknowledges that the trial court did not rely on Scott's testimony in reaching its value decision. *See infra* pp. 11-15. Given the absence of findings of fact and conclusions of law, we nonetheless address whether the trial court's judgment can be supported on the basis of implied findings of fact predicated on Scott's testimony.

6

to both." *Id.*

At trial, Scott testified that his responsibilities as a loan workout officer at Compass Bank are to "work with problem loan assets and to achieve the best possible outcome on those assets, when they have difficulties." Scott testified that his "experience included foreclosing on real estate collateral" and "reselling foreclosed real estate." He stated that he sold more than 5,000 properties following foreclosure; he never sold properties unless they had been foreclosed properties because the "bank is not in the business of buying and selling real estate in the usual course of business." Based on this testimony, we conclude that Scott was an officer of Compass Bank in a managerial position with duties related to the property. *See id.* at 849.[2]

Compass Bank asked Scott to state, "[a]s owner of the Frisco property on May 5 of 2009, once the bank foreclosed, what is the bank's opinion of the fair market value of the Frisco property at that time." The Borrowers objected because Scott had not been designated as an expert. When Compass Bank argued that Scott could give opinion testimony under the Property Owner Rule as an officer of Compass Bank even without having been designated as an expert, the Borrowers again objected to testimony from Scott opining on the property's fair market value. The trial court overruled the objection.[3]

---

[2] The dissent characterizes this conclusion as a holding that the Property Owner Rule applies to Scott, and that Scott's testimony properly was admitted under the Property Owner Rule. From this premise, the dissent asserts that the trial court properly could have relied on Scott's testimony because Scott's testimony properly was admitted. To be precise, we hold that Scott's testimony satisfied the first prong of the *Speedy Stop* standard for applying the Property Owner Rule to entities such as Compass Bank because he is an "officer[] . . . of the entity in [a] managerial position[] . . . with duties related to the property . . . ." *Speedy Stop*, 337 S.W.3d at 849. The second prong of the *Speedy Stop* standard focuses on a different issue by asking whether the officer with duties related to the property is "personally familiar with the property and its fair market value." *Id.* If the requisite familiarity with both the property and its fair market value is lacking, then any applicable presumption is rebutted and a valuation opinion from the officer is "no evidence" because (1) the court is barred by the Property Owner Rule from giving weight to the unfamiliar officer's unsupported opinion; and (2) the unsupported opinion amounts to no more than a mere scintilla. *See City of Keller*, 168 S.W.3d at 810.

[3] The dissent suggests that the Borrowers waived any objection to Scott's testimony on this point because their objection did not specifically reference Texas Rule of Evidence 701. We reject this suggestion. In response to the Borrowers' objection that "[t]his man cannot give opinion testimony"

Scott then testified as follows:

SCOTT: My opinion of the value —

COUNSEL FOR COMPASS BANK: No, the bank's opinion.

SCOTT: Yes.  As an officer of the bank, the opinion of the bank is that the value at the time of foreclosure was about one million dollars.

COUNSEL FOR COMPASS BANK: What does the bank base that conclusion on?

SCOTT: Based upon offers received and the information given to us by our internal and external valuation experts.

COUNSEL FOR COMPASS BANK: When you say offers, are these offers that the bank considered legitimate offers?

SCOTT: Absolutely.

COUNSEL FOR COMPASS BANK: Okay.  Did the bank consider the fact that this property was zoned only for multifamily housing?

SCOTT: That was part of the consideration.  Also part of the consideration was the fact that the zoning – the plat for this property expired in January 2010; therefore, in May 2009, if someone were to purchase the property and not already have the engineering and architectural plans for the property and approved construction for the property, then it is not feasible that they would be able to actually begin and complete construction in time to meet the local zoning and planning requirements.

COUNSEL FOR COMPASS BANK: Did the bank also consider that 20 percent of this property was in the flood plain and couldn't be built upon?

SCOTT: It did.  About two and a half acres are absolutely unusable for construction.

---

because he had not been designated as an expert and had not "been shown to have the expertise to be able to value property," Compass Bank expressly invoked the Property Owner Rule as applied to entities in *Speedy Stop* and referred to the opinion by name.  The Borrowers responded that Scott "does . . . not have the credentials for fair market value."  Compass Bank replied by reading a direct quote from *Speedy Stop* aloud to the trial court: "'We hold that the property owner rule applies to corporate entities owning property and that a representative of the corporate owner who is familiar with the market value of the property in question may testify under this rule as to the market value of the property without being designated as an expert witness.'"  The trial court then overruled the objection.  Even without a direct reference to Texas Rule of Evidence 701, this exchange fairly put the trial court on notice of the Borrowers' contention that Scott lacked sufficient familiarity to opine under the Property Owner Rule as applied to entities in *Speedy Stop*.  *See Speedy Stop*, 337 S.W.3d at 849 ("[T]he Property Owner Rule falls within the ambit of Texas Rule of Evidence 701 and therefore does not relieve the owner of the requirement that a witness must be personally familiar with the property and its fair market value . . . .").

COUNSEL FOR COMPASS BANK: Did the bank also consider the availability of financing at that time?

SCOTT: It did. Financing for raw land at that time was virtually nonexistent.

On cross-examination, the Borrowers questioned Scott regarding his views about a $2.73 million appraisal Compass Bank had received before the foreclosure sale from property valuation company Integra Realty, Inc.:

COUNSEL FOR BORROWERS: And you were delighted that it appraised for that much, because it was more than the bank had in the property, was it not?

SCOTT: That would be a mischaracterization of my evaluation of the circumstances.

COUNSEL FOR BORROWERS: And with respect to the property, you thought at that time, did you not, that if I foreclose on this, I can sell this property for more than the bank had in it, and the bank would come out looking good, would it not?

SCOTT: Sorry, the question is?

COUNSEL FOR BORROWERS: Sure. Isn't that what you thought?

SCOTT: No, ma'am.

COUNSEL FOR BORROWERS: You were in a rush to foreclose on this property, because you figured you could get a property in excess of what was owed on it and that would make you look good as the manager of special assets?

SCOTT: If you would review the documents provided to you in discovery, you will find when I received this appraisal, that I was shocked at the numbers the appraiser gave it and I challenged the appraisal through our appraisal group.

COUNSEL FOR BORROWERS: No, sir. You did that after you foreclosed on the property. You never complained about this appraisal until after you had foreclosed and tried to market it for a month; isn't that correct?

SCOTT: I don't remember the timing of receipt versus the timing of my complaint about the appraisal, but when I began to compare the appraisal with the reality in the market, the offers that were being received, the saturation in the market that I discovered existed, as well as our internal officer's experience in that market, it was quite disturbing, because this value, though based upon historical sales, was not reflective at the time of

9

the current interest in raw land.

COUNSEL FOR BORROWERS: Mr. Scott, isn't it true that you, after you had foreclosed, went and asked for the appraiser to come back and re-appraise this, and you were told it wouldn't do any good because the appraiser isn't going to lower the value much below that 2.7.

SCOTT: I was told that they would lower the value, but my appraisal group declined on having them submit their modification to the appraisal.

COUNSEL FOR BORROWERS: In fact, you were upset after the foreclosure, after you had tried to market this foreclosed property unsuccessfully for a month, you were upset because you had relied on that in foreclosing on this property; isn't that correct?

SCOTT: That is correct. And found that it was unrealistic in value.

In light of this testimony, Compass Bank contends that the trial court could consider Scott's opinion regarding the property's fair market value under the Property Owner Rule.

The supreme court's extension of the Property Owner Rule to entities does not dispense with the requirement that "a witness must be personally familiar with the property and its fair market value." *Speedy Stop*, 337 S.W.3d at 849. Thus, an officer or employee who lacks personal knowledge of the property in question and its fair market value is not a proper source of valuation testimony regardless of his job title. *See id*. at 849-50.

In *Speedy Stop*, the supreme court addressed whether LaBeff — the vice president of Speedy Stop's corporate general partner — could testify about the value of condemned property under the Property Owner Rule even though he had not been designated as an expert. The supreme court concluded that LaBeff could not testify under the Property Owner Rule because (1) he was not an officer or employee of Speedy Stop; (2) he did not specify in his affidavit that he was familiar with the property and its value; and (3) his affidavit failed to establish that his opinion was based on personal familiarity rather than an expert's "specialized knowledge, skill, experience, training, or education." *Id*. at 849.

In his affidavit, LaBeff stated that he (1) had been involved with the acquisition

and sale of all Speedy Stop convenience stores since 1982; (2) had been in charge of all real estate acquisitions and sales for Speedy Stop "for several years;" (3) was responsible for dealing with easement issues at all Speedy Stop convenience stores and fast food restaurants; (4) maintained familiarity with realty values in Harris County through various means in order to fulfill his job duties; (5) was aware of how a utility easement can affect the value of commercial property such as the tract at issue; and (6) was "making this affidavit on behalf of the owner, as the owner's representative and as the owner." *Id*. at 848. LaBeff also stated, "It is my opinion *based upon my knowledge, background, education and experience* that the difference in the fair market value of the property in question (which is the subject matter of the lawsuit) immediately before and immediately after the condemnation of this easement, was $62,000." *Id*. at 852. (original emphasis). "Further, it is my opinion as the owner of the property in question that the difference in value, immediately before and immediately after the condemnation, was $62,000, all because of the condemnation and the easement which resulted from the condemnation." *Id*.

The supreme court concluded that LaBeff's affidavit did not satisfy the Property Owner Rule because his opinion was based on "his expertise — his 'knowledge, background, education and experience' — not his personal familiarity with the Property" and its value. *Id*.

Here, Scott listed several factors Compass Bank considered in forming the "bank's opinion" that the property's value at the time of foreclosure was $1 million. However, listing factors considered by Compass Bank does not demonstrate Scott's **personal familiarity** with the property's value and knowledge of the market at the time of the foreclosure sale. *See id*. at 849-50, 852. Scott also testified that Compass Bank's opinion of the property's value was based on "offers received and the information given to us by our internal and external valuation experts." Scott testified that he compared Integra's $2.73 million appraisal with "the reality in the market;" offers Compass Bank received; "the saturation in the market;" and a Compass Bank "internal officer's experience in the

11

market." Based on this information, Scott opined that the $2.73 million appraisal value did not reflect "the current interest in raw land." Scott started questioning the appraisal and looking into market conditions only after he foreclosed on the property in reliance on the Integra appraisal and unsuccessfully marketed the property for one month.

This testimony shows that, as in *Speedy Stop*, the opining individual's property value opinion was based on sources of information other than his own personal knowledge and familiarity. Scott's opinion of fair market value at the time of foreclosure was based on information including offers received, information from "internal and external valuation experts," and another Compass Bank officer's experience. This is more in the nature of testimony predicated on a review of materials by a testifying expert. *See* Tex. R. Evid. 703. But Scott, like LaBeff in *Speedy Stop*, could not testify as an expert because he had not been designated as an expert. Scott did not testify that he was personally familiar with the market in Frisco at the time of the foreclosure sale; what Scott may have discovered after the foreclosure sale may or may not be reflective of the market or the property's value at the time of foreclosure.

At most, the record before us demonstrates that Scott had some familiarity with some of the property's attributes; the record here does not demonstrate that Scott had familiarity with the property's value based on those attributes. We therefore conclude that the evidence before us shows that the Borrowers rebutted the presumption that Scott was personally familiar with the property's fair market value in this case. Accordingly, his testimony cannot be relied upon under the Property Owner Rule and did not constitute evidence of market value that may be relied on to determine the property's fair market value.[4]

### B. Market Value Is Not Established By An Unaccepted Purchase Offer, A Property Foreclosure Bid, Or A Property Sale One Year After Foreclosure

We next consider the Borrowers' arguments that the amount Compass Bank bid

---

[4] In light of this disposition, we do not address whether Compass Bank properly could rely on the Property Owner Rule with respect to property that Compass Bank did not own on the date of foreclosure.

for the property at the foreclosure sale, the price at which Compass Bank sold the property one year after the foreclosure sale, and an unaccepted purchase offer to buy the property do not establish the property's fair market value at the time of foreclosure.

Scott testified at trial that Compass Bank bid $1.2 million for the property at the foreclosure sale; he testified that Compass Bank sold the property for $980,000 a year after the foreclosure sale.

Actual sales price is not evidence of fair market value when circumstances indicate that the sale is out of the ordinary in some way. *SPT Fed. Credit Union v. Big H Auto Auction, Inc.*, 761 S.W.2d 800, 801 (Tex. App.—Houston [1st Dist.] 1988, no writ). "'[E]vidence of what property sold for at a foreclosure sale is not competent evidence of its fair market value, since the transaction is not a free one between a willing seller and a willing buyer.'" *Id.* at 801-02 (citing *Price v. Gulf Atlantic Life Ins. Co.*, 621 S.W.2d 185, 187 (Tex. App.—Texarkana 1981, writ ref'd n.r.e.)).

Accordingly, Scott's testimony that Compass Bank purchased the property for $1.2 million at the foreclosure sale is incompetent evidence of the property's fair market value. *See id.* Evidence of the property's sale price of $980,000 a year after the foreclosure sale also is not competent evidence of fair market value in this case because the record does not reflect anything about the circumstances of the sale, *i.e.*, if the sale was "out of the ordinary in some way." There is no evidence regarding how the property was marketed a year later and whether market conditions were comparable to the conditions at the time of the foreclosure sale on May 5, 2009. *See id.* at 801; *see also Moore v. Bank Midwest N.A.*, 39 S.W.3d 395, 402 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

The Borrowers asked Scott about an unaccepted purchase offer they received from Landwhite Developers LLC about two weeks after Compass Bank purchased the property at the foreclosure sale. In the offer, Landwhite proposed the following terms with regard to the purchase price:

13

The purchase price of property shall be $2,500,000. All cash at closing less deposits and subject to customary adjustments and prorations. The purchase price will include the assignment to purchaser of all building plans and site plans, building specification survey, engineering report, geotechnical reports, environmental reports and all other project related materials and plans. Purchase price will also include the transfer and assignment to the purchase of all approvals, development rights and permits obtained, applied for by seller.

The Borrowers argue that the trial court could not rely on unaccepted offer evidence in determining the property's value because such evidence is not evidence of fair market value as a matter of law.

"Texas courts have long held that unaccepted offers to purchase property are no evidence of market value of property." *Lee v. Lee*, 47 S.W.3d 767, 785 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (citing *Hanks v. Gulf, Colo. & Santa Fe Ry. Co.*, 159 Tex. 311, 320 S.W.2d 333, 336-37 (1959)). Therefore, the trial court could not rely on any evidence relating to an unaccepted purchase offer or the terms of that offer in determining the property's fair market value in this case.

Compass concedes that unaccepted offers generally are not evidence of fair market value. However, Compass Bank argues that the trial court did not rely on unaccepted offer evidence in determining the property's fair market value and deficiency. Instead, Compass Bank contends that "having been introduced to the information through Appellants' evidence and cross examination, the trial court appears to have determined based on . . . Howe's testimony that . . . additional assets – the 'other project related materials and plans . . . approvals, development rights, and permits (obtained or applied for)' – had value."

Compass Bank points to testimony from the Borrowers' valuation expert, Howe, who testified that the Borrowers had invested approximately $300,000 as of May 2009 in what the trial judge referred to as "the specs, the reports, plans, and all of the paperwork." Compass Bank contends that the trial court's valuation is supported because Howe's property valuation of $2.7 million "less his $300,000.00 value of the peripherals equals

14

the trial court's $2.4 million valuation determination."

Compass Bank relies on the following exchange between the trial court and Howe to support its argument:

> THE COURT: I've got one [question]. I asked this before, but I think you are probably the only person who can answer it. What amount of money, as of May of 2009, did your company have invested in the specs, the reports, plans, and all of the paperwork involved in the development of this piece of property?
>
> HOWE: Without having numbers directly in front of me, it was close to $300,000.
>
> THE COURT: That would have been my guess. So, if — just doing the math then, netted out, it would be 2.2 — if you had been able to put together a package deal that everybody was interested in after the $2.5 million offer, there would have been a net of 2.2 for the land.
>
> HOWE: No, sir, we would not have got anything for the plans.
>
> THE COURT: I know you may not have got anything in your plans, but if the buyer was insisting on getting all of the plans and you had to throw them in to make the deal go, then the cost of the land on an allocation between the plans and the land, the land would be about 2.2 and the plans would be worth about three — point three. You see what I am doing?
>
> HOWE: I see what you're saying. It wouldn't work exactly like that, because there is interest accrued in that $300,000; there is [sic] other costs included in that $300,000 that wouldn't be a part of it. But I understand what you're saying.
>
> THE COURT: Y'all see what I am saying?

Compass Bank's contention that the trial court was not guided by unaccepted offer evidence is contradicted by the trial court's statements:

> THE COURT: Well, the only evidence — it seems to me the only pure evidence I have of the issue in this case is Mr. Howe's opinion and the bank's opinion. I mean, those are the only two opinions that have been expressed. I don't have any independent third-party opinions backed up by data of the value on that date. You all have not brought me anything that I — I have the former owner's opinion and the owner-to-be's opinion of the value. That's all that you all technically brought me. And then I have these other data points, offers that were made, maybe. Sales afterwards. Other things that shed some light on minimum values, maybe, or maximum

15

values, I don't know. . . . I either adopt somebody's opinion or I take my best stab of what the value probably was about that time and go from there.

\*        \*        \*

THE COURT: Here's what I'm thinking. The closest value that we have in terms of time, chronologically, is that offer of May. It's a little less than the fair market value in the [Integra] appraisal of the end of February [of $2.73 million] and it includes the written plans and all of that, so my inclination is to — so, if I take the 2.5 million in that offer and I knock off the value of the specs and plans, that gives a 2.2 million for the — take off 300,000 for the specs and plans, that would leave a value of 2 million for the land alone, which is half a million less than the appraisal. So that's not inconsistent with the appraisal of a couple of months earlier. So a fair market value of 2.2 million, a foreclosure debt of 2.6, round numbers, will leave a deficiency of 400,000. Or a 2.2 credit against the deficiency amount, 2.6 would be a deficiency of about 400,000. That's where I'm coming out on it.

\*        \*        \*

THE COURT: I didn't use that offer. I calculated my own, because you all didn't give me a — nobody gave me, other than two interested parties' opinions, nobody gave me a fair market value as of the date of foreclosure. That's the way I see the evidence right now.

\*        \*        \*

THE COURT: Okay. So, I mean, I don't know that I have to accept either of those opinions, so I didn't. I formulated my own best estimate.

We reject Compass Bank's argument that the trial court properly "accepted Mr. Howe's $2.7 million [valuation] opinion as a starting point, declined to accept Mr. Howe's position that the survey, plans and approvals should not be considered, subtracted out $300,000 for those ancillary items and valued the property at $2.4 million."

The record contains no evidence that the cost of preparing "specs and plans" — in any amount — affected the property's value and should be considered in determining fair market value. Except for the terms of the unaccepted Landwhite offer (which constitutes no competent evidence of market value), there is no evidence suggesting that having "specs and plans" would increase the fair market value of raw land — or that not having "specs and plans" would decrease the fair market value of raw land. Accordingly, evidence of the value of "specs and plans" is no evidence of fair market value and cannot

16

be considered in determining the property's fair market value in this case. We conclude that there is legally insufficient evidence to support the trial court's finding that the fair market value of the property was $2.4 million at the time of the foreclosure sale.

## C. Unchallenged Expert Testimony

We next address the Borrowers' argument that, "because there was no legally sufficient evidence to support the trial court's finding of a fair market value as of May 5, 2009, of less than" $2.7 million, the trial court erred by concluding a deficiency existed in this case. In that regard, the Borrowers argue that Howe's unchallenged expert opinion was the only evidence of the property's fair market value presented at trial; his opinion established that the property's fair market value at the time of the foreclosure sale was at least $2.7 million; and, therefore, the fair market value exceeded the amount Borrowers owed Compass Bank after the foreclosure sale.

Although a factfinder is not bound to accept valuation expert testimony, it cannot "leap entirely outside of the evidence in answering" a valuation question. *See Callejo v. Brazos Elec. Power Co-op., Inc.* 755 S.W.2d 73, 75 (Tex. 1988). A factfinder also is not entitled to rely on its "own knowledge and experience as a substitute for" a party's evidence on value. *Id.* A factfinder is allowed to set the value at any amount between the lowest and highest values by the evidence. *State v. Huffstutler*, 871 S.W.2d 955, 959 (Tex. App.—Austin 1994, no writ).

Howe's expert testimony on the property's fair market value was unchallenged at trial and remains unchallenged on appeal. Compass Bank did not present expert testimony or any other competent evidence that the trial court could have relied upon in determining a fair market value of $2.4 million. The only evidence of fair market value is Howe's unchallenged expert opinion that the property value at the time of the foreclosure sale was $2.7 to $2.8 million.

We also note that, although the fair market value of the property as determined in the Integra appraisal was discussed at trial, the appraisal never was admitted into

evidence "for the truth of what's asserted therein." The following exchange confirms this determination:

> COUNSEL FOR BORROWERS: And you went and you got Integra appraisers — the bank went and hired Integra Appraisals to appraise this property, did it not?
>
> SCOTT: It did.
>
> COUNSEL FOR BORROWERS: And they came back and told you that the fair market value of this property—
>
> COUNSEL FOR COMPASS BANK: Objection, your Honor. This is a hearsay question. She is asking about an appraisal for a value from appraiser for the truth of the matter asserted, which is what the value he stated in that appraisal is.
>
> THE COURT: Well, maybe so, but you opened this up by getting his opinion on what the property was worth, and I would like to hear what his opinion was based on.
>
> *  *  *
>
> THE COURT: It's part of what the information he got in forming his opinion.
>
> *  *  *
>
> COUNSEL FOR BORROWERS: Judge, we would offer, at this time, Defendant's Exhibit 1 [the Integra appraisal].
>
> COUNSEL FOR COMPASS BANK: Objection, your Honor, hearsay. That person who prepared that appraisal is not here to testify; cannot be examined on any of the assumptions or anything else that are contained in that appraisal to allow the Court to understand the basis for that appraisal at the time it was made. It's strictly hearsay.
>
> THE COURT: The hearsay objection is sustained in the sense that I'm not going to accept it for the truth of what's asserted therein, but it will be admitted as an operative document, as something the bank had in front of it. And I think this witness, having opined as to the value of the property, can be examined about what somebody else said about the value of the property, that he had available to him at the time.

Because the Integra appraisal never was admitted "for the truth of what's asserted therein," it is not competent evidence of fair market value and cannot be relied upon to

18

establish a range of values.[5]

Additionally, the trial court indicated that it did not rely on the Integra appraisal in determining the property's value in this case:

> THE COURT: Well, the only evidence — it seems to me the only pure evidence I have of the issue in this case is Mr. Howe's opinion and the bank's opinion. I mean, those are the only two opinions that have been expressed. I don't have any independent third-party opinions backed up by data of the value on that date. You all have not brought me anything that I — I have the former owner's opinion and the owner-to-be's opinion of the value. That's all that you all technically brought me. And then I have these other data points, offers that were made, maybe. Sales afterwards. Other things that shed some light on minimum values, maybe, or maximum values, I don't know. But I really don't have a hard, you know, an independent gauge of the value on the foreclosure date, so I'm going to have to make my best stab. Either that, or — I mean, I don't — I either adopt somebody's opinion or I make my best stab of what the value probably was about that time and go from there.

Under these circumstances, there is no evidence in the record before us to support a finding that the property's value was less than $2.7 million.

It follows that the trial was not authorized to find that the property's value was $2.4 million when the only competent evidence presented at trial supports a fair market value of at least $2.7 million. *See Callejo*, 755 S.W.2d at 75 ("There is simply no testimony or other evidence in this record" to support the jury's easement value of $364,928.80 when no witness testified that the value was higher than $33,541); *Huffstutler*, 871 S.W.2d 959 (affirming judgment notwithstanding the verdict because the only evidence of value was the testimony of one expert that the property's value was $310,000 and the owner's testimony that the property's value was $450,000, but the jury

---

[5] The dissent contends that "Howe also reviewed and considered" the February 27, 2009 Integra appraisal of the property. The record does not support any suggestion that Howe relied in whole or in part on the Integra appraisal in forming his own expert opinion regarding the property's value at the time of foreclosure. After the trial court ruled that it was "not going to accept [the Integra appraisal] . . . for the truth of what's asserted therein," the Borrowers questioned Howe about the appraisal. Howe answered the questions asked of him. Howe did not base his expert valuation testimony on the appraisal. Instead, Howe based his expert valuation testimony on his expertise regarding conditions in the Frisco market in 2008 and 2009.

assigned the property a value of $230,000); *First State Bank v. Keilman*, 851 S.W.2d 914, 930 (Tex. App.—Austin 1993, writ denied) ("Except for the fact that the jury's figure falls in between the Keilmans' $7,161.44 figure and FSB's $0 figure, it appears that the jury pulled its answer out of a hat" when both the Keilmans and FSB provided a relatively precise method for calculating unauthorized interest.); *Wegner v. State*, 829 S.W.2d 922, 923 (Tex. App.—Tyler 1992, writ denied) ( "The Wegners' two value witnesses provided the only evidence on the issue.  Their valuations of remainder damage ranged from $97,894 to $99,000.  The State presented no evidence of the . . . value . . . from which the jury could have arrived at its answer of $30,000.").

A factfinder need not accept valuation evidence that it has determined to be lacking in credibility.  *See, e.g.*, *2218 Bryan St., Ltd. v. City of Dallas*, 175 S.W.3d 58, 66-67 (Tex. App.—Dallas 2005, pet. denied) (factfinder not required to accept valuation expert's testimony in face of specific finding that testimony is not credible even if no other valuation testimony is proffered).  This record contains no such determination with respect to Howe, who was designated as an expert and testified as an expert.  And, although a factfinder has discretion to set the property value at any amount between the range of values introduced into evidence, *Huffstutler*, 871 S.W.2d at 959, a factfinder may not assess a value amount neither authorized nor supported by the evidence.  *See Keilman*, 851 S.W.2d at 930.

The dissent suggests that the following factors affected the property's value and would justify a reduction from $2.7 million: "[T]he market for raw land had dropped in the interim; available financing was limited; part of the property was within the flood plain; the Borrowers had the property on the market unsuccessfully for 2-3 months prior to foreclosure; and the value of the property was impacted by a foreclosure sale and its sale by a bank."  This contention does not support a valuation of $2.4 million because evidence of indeterminate "factors," standing alone, does not suffice to establish market value.  No evidence in this record provides a means of computing a discounted $2.4 million value based on the impact of these unquantified factors, or a range within which

20

the trial court could have chosen a value based on the identified factors. Therefore, identification of these factors alone does not support a valuation of $2.4 million.[6]

We also disagree with the dissent's assertion that the trial court could have considered the subsequent sale of the property for $980,000 — one year after the foreclosure sale — as some evidence that the property was worth less than 2.7 million in May 2009. Even if we assume that the 2010 sale was between a willing buyer and a willing seller, there is no evidence regarding how the property was marketed to attract the assumed willing buyer a year after the foreclosure sale and whether market conditions were comparable to the conditions at the time of the foreclosure sale a year later. Additionally, even if the subsequent property sale for $980,000 could have been considered as some evidence that the property was worth less than $2.7 million at the time of the foreclosure sale a year earlier, this evidence does not support Compass Bank's reliance on an assumption that the trial court subtracted $300,000 from Howe's $2.7 million valuation.[7]

Because the evidence authorized only a finding of a fair market value of at least $2.7 million, we conclude that the trial court erred by using a lower figure and finding a deficiency. At the time of the foreclosure sale, the Borrowers owed Compass Bank $2,529,172.64, and the property's fair market value was at least $2.7 million. Accordingly, the trial court erred by finding a deficiency of $129,172.64. We sustain the Borrowers' first issue.

---

[6] Howe, in contrast, testified that adverse changes in market conditions between February 2008 and May 2009 reduced the property's market value by approximately 10 to 12 percent from its $3.2 million purchase price.

[7] In arguing that the trial court admitted evidence of the $980,000 sale price from 2010 as "some evidence of what the land was worth at the time in question," the dissent relies upon a statement made by the trial court in response to an objection during questioning of Howe. Compass Bank's counsel asked Howe: "Can you explain for me, then why one year after the foreclosure sale the bank was only able to sell it for $980,000?" Counsel for the Borrowers objected to the question because it assumed facts not in evidence and on relevancy grounds. The trial court stated: "Well, I assume that he can link it up to the facts eventually. And I'll admit it as some evidence of what the land was worth at the time in question." It is unclear whether "time in question" refers to the time of the foreclosure sale or the time of the subsequent sale in 2010. In any event, the question was stricken after an additional colloquy with the trial court and Howe never answered it.

## III.    Disposition

In their second issue, the Borrowers contend that the trial court should have entered a take nothing judgment against Compass Bank because the evidence established that the property's fair market value at the time of the foreclosure sale was at least $2.7 million and therefore exceeded the debt the Borrowers owed Compass Bank.  The Borrowers ask this court to reverse and render judgment in their favor.

We must determine what the appropriate appellate disposition is in this case.  The rules of appellate procedure provide that reversal requires rendition of a judgment unless a remand is necessary for further proceedings.  Tex. R. App. P. 43.3(a).  We can render judgment only if there is no evidence to support the deficiency amount awarded by the trial court, and if the evidence conclusively establishes that there is no deficiency.  *See Westtex 66 Pipeline Co. v. Baltzell*, No.01-01-00826-CV, 2003 WL 21665312, at *8 (Tex. App.—Houston [1st Dist.] July 17, 2003, pet. denied) (mem. op.); *Hill v. Spencer & Son, Inc.*, 973 S.W.2d 772, 776 (Tex. App.—Texarkana 1998, no pet.); *Wegner*, 829 S.W.2d at 923.  As discussed above, the only competent and unchallenged evidence of the property's fair market value at the time of the foreclosure sale presented at trial was $2.7 to $2.8 million; the debt the Borrowers owed at the time of the foreclosure sale was $2,529,172.64.  Therefore, the fair market value was greater than the debt amount the Borrowers owed Compass Bank and, as a matter of law, there is no deficiency.

The correct appellate remedy is to reverse the trial court's deficiency judgment and render a take nothing judgment against Compass Bank.  We sustain the Borrowers' second issue.

### Conclusion

Having concluded that (1) the trial court's value determination of $2.4 million and thus the deficiency judgment was not supported by competent evidence; (2) the only competent evidence established a property fair market value of at least $2.7 million; and (3) there is no deficiency because the debt the Borrowers owed was less than the

property's fair market value at the time of the foreclosure sale, we reverse the trial court's deficiency judgment and render a take nothing judgment against Compass Bank.


/s/    William J. Boyce
Justice


Panel consists of Justices Brown, Boyce, and McCally.  (McCally, J., dissenting).