Opinion filed July 29, 2016



In The

# Eleventh Court of Appeals

_____

## No. 11-14-00164-CV

_____

## ONCOR ELECTRIC DELIVERY COMPANY LLC, Appellant
## V.
## EL HALCON INVESTMENTS LLC, Appellee

**On Appeal from the County Court at Law**
**Brown County, Texas**
**Trial Court Cause No. CV1103096**

### M E M O R A N D U M   O P I N I O N

This case arose from a condemnation suit. Appellant, Oncor Electric Delivery Company LLC, acquired an easement, via eminent domain, over approximately fifty-six acres of a 4,449.57-acre ranch (Lee Ranch) in Brown and Mills Counties that is owned by Appellee, El Halcon Investments LLC. Oncor used the easement to install an electric transmission line. El Halcon stipulated at trial that Oncor had the right to condemn the easement; the only issue for the jury to decide was the measure of damages. The jury found that the difference in market value of Lee

Ranch, from immediately before and immediately after the condemnation, was a net decrease of $667,500, which was approximately $150 per acre. We affirm.

I. *Evidence at Trial*

Oncor installed an electric transmission line in 2002 across an easement it had over Lee Ranch. Oncor acquired a second easement in 2011. The second easement ran immediately adjacent and parallel to the then-existing electric transmission line; Oncor installed a second transmission line next to the existing line, and the two lines were part of the largest class of Oncor transmission lines in Texas. Todd Whitley, who managed Oncor's construction management division, testified that each of the towers that supported six transmission lines, three on each side of each tower, had a base of four legs and was as tall as a twelve-story building. The ranch manager, Kurt Martin, testified that the transmission lines and towers could be seen from nearly every location on the ranch. Martin further explained that, in order to install the 2011 transmission line, Oncor had to clear hundreds of trees along a strip of land 160 feet wide and totaling approximately fifty-six acres of land.

Approximately one year before the 2011 condemnation, El Halcon purchased Lee Ranch from the Estate of Nancy Lee for $2,150 per acre. Prior to the purchase, David Copeland, who is the sole member of El Halcon, learned of the plan to install the second transmission line across the ranch. He negotiated an agreement with the Estate that it would not make any agreements with Oncor as to compensation for the condemned easement. Copeland wanted to negotiate with Oncor as to the appropriate compensation for any decrease in the ranch's market value. Copeland also wanted to negotiate additional provisions as part of the easement.

Copeland testified that the ranch's sale price did not reflect the decreased value of Lee Ranch due to the condemnation. At trial, expert witnesses gave differing opinions on how the condemnation affected Lee Ranch's market value. Copeland testified that the condemnation decreased Lee Ranch by $1,112,250,

which was a market value decrease of approximately $250 per acre. The jury awarded El Halcon $667,500, which was a market value decrease of approximately $150 per acre.

## II. *Issues Presented*

Oncor asserts in its first issue that the trial court abused its discretion when it admitted unreliable testimony from Copeland about the ranch's market value and about the decrease in market value caused by the second easement; Oncor also claims that the error was harmful. In its second issue, Oncor argues that the evidence was legally and factually insufficient to support the jury's verdict.

## III. *Analysis*

### A. Issue One: Admissibility of Copeland's Valuation Testimony

Oncor asserts that the trial court abused its discretion when it admitted Copeland's testimony because Copeland gave no basis for his opinion, but only a bare conclusion of damage without any explanation, and Copeland based his opinion on evidence that the trial court held was inadmissible because that evidence was unreliable. As we explain below, we disagree with Oncor's assertions and conclude that Copeland's testimony was substantiated and admissible.

#### 1. Standard of Review

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). Oncor asserted that the trial court should have excluded Copeland's valuation testimony because he based it solely on his "unsupported 'belief' as to the before and after condemnation values of [Lee Ranch]." A property owner may testify as to the value of his property, but his testimony must meet the same requirements as other

opinion evidence. *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 155–56 (Tex. 2012) (citing *Porras v. Craig*, 675 S.W.2d 503, 505 (Tex. 1984)). Under the "Property Owner Rule," a property owner's valuation testimony fulfills the same role as expert testimony. *Id.* at 157. Property-owner testimony is the functional equivalent of expert testimony, and it must be judged by the same standards. *Id.* at 159. The property owner, who is presumed to be familiar with his own property, is permitted an exception to the rule that a witness establish his qualifications to opine on land values. *Id.* at 157.

### 2. Fair Market Value of Property

Texas case law has outlined that a property's fair market value is "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001) (quoting *State v. Carpenter*, 89 S.W.2d 979, 980 (Tex. 1936)). "The three traditional approaches to determining market value are the comparable sales method, the cost method, and the income method." *Id.* (citing *Religious of Sacred Heart of Tex. v. City of Houston*, 836 S.W.2d 606, 615–17 & n.14 (Tex. 1992)). Appellant complains that Copeland's failure to use the comparable sales method made his testimony inadmissible. As we explain below, we disagree.

### 3. Admissibility of Landowner's Testimony on Market Value

Oncor asserts that Copeland's testimony was not sufficiently supported by facts when Oncor's counsel asked, "Let me ask you one more time. Tell the jury -- would you, please, tell the jury what factual basis you used in determining $2400 per acre was the value of the property before Oncor acquired this easement?" Copeland responded, "That was my belief." But Oncor fails to look at how, through nearly 100 pages of the reporter's record, Copeland explained the basis of his opinion and belief as to the ranch's market value and its decrease in value. We do

4

not agree with Oncor that Copeland's testimony was based solely on his "belief" or, put another way, was *ipse dixit*.[1]

As with expert testimony, an owner's property valuation may not be based solely on the owner's *ipse dixit*. *Justiss*, 397 S.W.3d at 159. An owner may not simply echo the phrase "market value" and state a number to substantiate the owner's claim; rather, the property owner must provide the factual basis on which the opinion rests. *Id.* This burden is not onerous, particularly in light of the resources available today. *Id.* Evidence of nearby sales, price paid, tax valuation, online resources, appraisals, and any other relevant factors may be offered to support the property owner's claim. *Id.* Furthermore, the property owner's testimony must not be in reference to his personal valuation; rather, it must be tied to some measure of market value. *Id.* at 155–56. An unsupported opinion constitutes no evidence and will not support a judgment even if it was admitted at trial without objection. *Id.* at 156–57.

### 4. Copeland explained the basis for his assessment of the ranch's decrease in market value.

Copeland explained that, during the past fifteen years, he had bought and sold numerous ranches in Texas. He said that he was successful in the ranch real estate market because he made money on each ranch that he sold. He kept up with the ranch real estate market; read magazines about the ranch real estate market; reviewed property listings, including ones in Brown County and Mills County; and stayed in touch with real estate brokers, including in Brown County. He said that he "had realtors down here [in Brown County] that became friends and knew that [he] had been in the real estate business and buying and selling real estate. So, [he] would get calls from those guys, and [he] would stay plugged into what they were talking about the market."

---

[1] "*Ipse dixit*" is defined as "[s]omething asserted but not proved." *Ipse Dixit*, BLACK'S LAW DICTIONARY (10th ed. 2014).

Copeland testified about his knowledge of land prices in Brown County and Mills County. Copeland and a business partner had purchased Pecan Springs Ranch, a 2,000-acre ranch located in Brown County.[2] After that, Copeland purchased another 235 acres that were adjacent to Pecan Springs Ranch, bringing his total ownership of land in Brown County, exclusive of the Lee Ranch acreage, to 1,235 acres. Copeland testified that, when he purchased Lee Ranch, land in Mills County was selling for $3,200 to $3,800 per acre, while land in Brown County was selling for $2,400 to $2,800 per acre.

Copeland explained that he was not in the market to buy another ranch; thus, he was only prepared to buy if he was able to purchase for a good price. He explained that the ranch was a good deal if he could pay below market value for it. Copeland noted that Lee Ranch was not being marketed with a broker when he bought it. Copeland testified that Lee Ranch had "some Federal tax lien issues." *See W. AH 406 Ltd. v. Cent. Appraisal Dist. of Taylor Cty.*, 213 S.W.3d 544, 546 (Tex. App.—Eastland 2007, pet. denied) (encumbrances, restrictions, contracts, or other items of similar nature may affect fair market value; loan agreement between property owner and United States Air Force that limited occupancy and rent was factor in value). Copeland explained that the Estate's representative "made it clear that there were no heirs that wanted the land, [and that] the property was going to be sold."

At the time of the purchase, Lee Ranch belonged to the Lee Estate, which was going through the probate process. According to Copeland, "There were 13 or 14 heirs, distant heirs that just wanted a check." Copeland explained that the ranch's large acreage was another appealing factor; the ranch was a "very unique property" with "lots of water, lots of great trees." He had "never seen a property like" Lee

---

[2]Copeland and his business partner negotiated an agreement to split Pecan Springs Ranch in half, with each of them getting approximately 1,000 acres.

Ranch and thought that it was "shockingly beautiful" the first time he saw it. Copeland testified that, in light of the circumstances, the value of Lee Ranch was actually $2,400 per acre when he bought it. With more advertising and less desire to simply get a check, he opined that Lee Ranch could have been sold for $2,400 per acre, which would have provided immediate equity in Lee Ranch by a measure of $250 per acre.[3] We note that actual sale price is not necessarily evidence of fair market value when circumstances indicate that a sale is out of the ordinary in some way. *See generally Preston Reserve, L.L.C. v. Compass Bank*, 373 S.W.3d 652, 663 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

### 5. *The lack of similar properties limits use of comparable sales method.*

Oncor asserts that Copeland's failure to provide evidence of comparable sales, as defined by Oncor as sales of ranches in Brown County of over 1,000 acres, rendered his opinion "a bare conclusion of damage without any explanation." Copeland acknowledged that he could not "identify a 1,000-acre or larger ranch that sold for" $2,400 per acre in Brown County. Consequently, Oncor claims that Copeland's opinion that Lee Ranch was really worth $2,400 at the time of the condemnation was not sufficiently supported by facts. When asked what the basis of his opinion was in light of the fact that he did not present comparable sales, Copeland said, "In my opinion, there is no comparable property. [Lee Ranch] is a very, very unique property. . . . I don't think there is a comparable sale. I think [Lee Ranch] is a highly unusual property." He said that he "could have looked a long time in 2010 and not found another 4,400-acre ranch for sale in Brown County that had these amenities. Never would have found it. *There is no comparison*" (emphasis added). In order to utilize a comparable sales method, the sale must be voluntary,

---

[3]That being the difference between Copeland's opinion as to value as reflected by other property sales in the area and his and the Estate's circumstances, $2,400 per acre, and the price Copeland actually paid for Lee Ranch, $2,150 per acre.

take place near in time to condemnation, and involve land with similar characteristics; if comparison is too attenuated, then the trial court should refuse to admit evidence of a comparable sale. *See Holiday Inns, Inc. v. State*, 931 S.W.2d 614, 623–24 (Tex. App.—Amarillo 1996, writ denied) (remoteness in time); *Urban Renewal Agency of Austin v. Georgetown Sav. & Loan Ass'n*, 509 S.W.2d 419, 421–22 (Tex. Civ. App.—Austin 1974, writ ref'd n.r.e.) (similarity of neighborhood). Based on his background, experience, and sources of knowledge, Copeland testified that Lee Ranch, which had no comparison in Brown County, was worth $2,400 per acre before the condemnation and $2,150 per acre after the condemnation.

### 6. *Copeland substantiated his market value evaluation of the ranch.*

Copeland explained that the fifty-six acres that made up the easement "is really not entirely mine to use. I have lost property rights, as explained by Oncor's witness and by Mr. Martin. So, [the acreage is] there. I can cross it. I can use it in a limited way." He continued, "What it amounts to is you can run cattle on it, and you could cultivate it if you wanted to. So, I think that is about the only use that an owner gets out of the property that is under power lines burdened by this easement." Copeland explained his background, knowledge, and experience in the ranch real estate market, and he substantiated how he determined his valuations, which included information on the factors that affected the sales price, his costs to acquire the property, the property's unique characteristics and limitations, the unavailability of comparable properties in Brown County, and the fact that ranching and cultivation were the only ways to generate income. *See Justiss*, 397 S.W.3d at 159 (a property owner's opinion "must be substantiated"). Copeland explained how and why the condemnation decreased the market value of his property. *See Justiss*, 397 S.W.3d at 159; *see also Dallas Cty. v. Crestview Corners Car Wash*, 370 S.W.3d 25, 40–41 (Tex. App.—Dallas 2012, pet. denied) (thirty-year car wash owner's opinion on market value was admissible, even though he was not an appraiser, did not provide

market data, and did not prepare expert report). The supreme court has explained that comparable sales is but one method, from a non-exhaustive list of possible methods, that could serve to support a property-owner's valuation testimony. *Justiss*, 397 S.W.3d at 159. We cannot say that the trial court abused its discretion when it admitted Copeland's testimony. Copeland's testimony was not inadmissible simply because Copeland did not present comparable sales data, especially when other appraisals of a $50 decrease and a $115 decrease in value per acre were in evidence; rather, Oncor's objection goes to the weight the jury could give Copeland's testimony. *See McKinney Ind. Sch. Dist. v. Carlisle Grace, Ltd.*, 222 S.W.3d 878, 882 (Tex. App.—Dallas 2007, pet. denied) (citing *Tex. Elec. Serv. Co. v. Wheeler*, 551 S.W.2d 341, 342–43 (Tex. 1977) (per curiam) (op. on reh'g)); *see also Crestview Corners Car Wash*, 370 S.W.3d at 40.

### 7. Copeland's testimony was not based on unreliable evidence.

Oncor argues that Copeland's testimony was unreliable because he based it solely on an expert's opinion that the trial court excluded on grounds of unreliability. Oncor cites Copeland's deposition testimony in which he stated, "It's my view that [my expert appraiser's] number of something like $476,000 for a diminishment value of the north half [of Lee Ranch] should be doubled and add back in the value of 57 acres. That comes out to about $1,061,000." At trial, however, Copeland's testimony was different. There, he opined that the condemnation decreased the value of Lee Ranch by $1,112,250. At no point in Copeland's testimony did he reference an expert's, or any other person's, valuation opinion. Therefore, we cannot say that Copeland based his valuation testimony at trial on his expert's unreliable opinion, and we reject Oncor's assertion otherwise. Having found that Copeland's testimony was supported by sufficient facts and that he did not base his testimony on unreliable expert testimony, we overrule Oncor's first issue and, therefore, need not address Oncor's harm argument. We now turn to Oncor's second issue.

*B. Legal and Factual Sufficiency*

Oncor asserts in its second issue that the evidence is both legally and factually insufficient to sustain the jury's verdict. We review a legal sufficiency challenge to the evidence in a light that tends to support the disputed finding and disregard all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001). We "assess all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in favor of the judgment." *City of Austin Police Dep't v. Brown*, 96 S.W.3d 588, 593 (Tex. App.—Austin 2002, pet. dism'd) (citing *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex. 1998)). A no-evidence challenge fails if more than a scintilla of evidence supports the challenged finding. *See Wal–Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003); *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999).

We review a factual sufficiency challenge by examining all of the evidence in the record, both for and against the lower court's findings. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). We must consider and weigh all such evidence in a neutral light. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). But factfinders "are the sole judges of the credibility of the witnesses and the weight to give their testimony." *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). We will sustain a factual sufficiency challenge only if the evidence supporting the finding is so weak or so against the great weight of the evidence that the finding is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Copeland had successfully bought and sold for a profit numerous ranches in various parts of Texas for approximately fifteen years. Copeland monitored the ranch real estate market, read magazines, reviewed listings, talked to real estate brokers—including in Brown County—and "had realtors [in Brown County] that

became friends and knew that [he] had been in the real estate business and buying and selling real estate. So, [he] would get calls from those guys, and [he] would stay plugged into what they were talking about the market." Copeland had purchased Pecan Springs Ranch, which was located in Brown County, and had purchased another 235 acres adjacent to Pecan Springs Ranch, bringing his total ownership of land in Brown County, exclusive of the Lee Ranch acreage, to 1,235 acres. Based on his background, experience, and sources of knowledge, Copeland opined that Lee Ranch was worth $2,400 per acre before the condemnation, which included the knowledge that there was one set of transmission lines already on the property. Copeland opined that, after the condemnation for the second set of transmission lines, Lee Ranch was worth $2,150 per acre. The decrease in the ranch's market value, he opined, was $1,112,250, which equals approximately $250 per acre. Although some of Copeland's testimony included information that could encompass the ranch's market value as well as his personal value, this type of information goes to the weight of his testimony, which the jury was free to accept or reject. The jury awarded $667,500, or approximately $150 per acre, which was less than Copeland's evaluation of the decrease in the ranch's market value. We hold that there is some evidence to support the jury's verdict.

Both Oncor and El Halcon presented expert witness testimony on the effect the condemnation had on the ranch. Several appraisals presented at trial outlined a change in value of Lee Ranch: David Harry opined that there was approximately a $50 per acre decrease in value, while David Bolton opined that there was a $115 per acre decrease in value. El Halcon's bank showed that there was an $850 increase per acre after El Halcon's purchase of the ranch. When there are competing contentions supported by expert witnesses on both sides, the burden is on the jury to determine which contention is most credible. *Allstate Tex. Lloyds v. Mason*, 123 S.W.3d 690, 703 (Tex. App.—Fort Worth 2003, no pet.) (citing *Turner v. KTRK*

*Television, Inc.*, 38 S.W.3d 103, 134 (Tex. 2000)).  With competing opinions as to damages, we cannot say that the jury's award of damages in the amount of $150 per acre was against the great weight and preponderance of the evidence.

Oncor argues that *Callejo v. Brazos Electric Power Cooperative, Inc.* controls and that its holding disallowed the "blending" of various experts' before-condemnation and after-condemnation valuation opinions in order to settle on a damage award.  755 S.W.2d 73, 75 (Tex. 1988).  In *Callejo*, the supreme court held that the jury's finding as to the after-condemnation value of a condemned property was supported by no evidence because the jury "blended" before- and after-condemnation values.  *Id.* at 75.  In doing so, the jury found the after-condemnation value was $364,928.80, which was more than ten times greater than any witness's opinion—for either the plaintiff or the defendant—as to the after-condemnation value.  *Id.*  Therefore, there was no evidence to support the after-condemnation value.  *Id.*  Here, the jury was not charged with determining both before and after valuations independently.  Rather, it gave one answer as to damages generally, and that damage award is supported by Copeland's testimony alone.  Therefore, *Callejo* is not applicable.  We have reviewed the evidence and conclude that the evidence is both legally and factually sufficient to support the jury's verdict.  We overrule Oncor's second issue.

## IV. *This Court's Ruling*

We affirm the judgment of the trial court.


July 29, 2016                                                    MIKE WILLSON

Panel consists of: Wright, C.J.,                           JUSTICE
Willson, J, and Bailey, J.


12