Michael **SILBERSTEIN**, Individually, Michael R. Silberstein, Ltd., Magic Homes Investments, Ltd. and Annette Silberstein, Appellants

v.

**TRUSTMARK NATIONAL BANK f/k/a Republic National Bank**, Appellee

NO. 14–14–00660–CV

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed January 7, 2016

---

Sanford L. Dow, Houston, for Appellants.

Donald L. Turbyfill, Deborah Colleen Simm Riherd, Houston, for Appellee.

Panel consists of Justices Jamison, McCally, and Wise.

## OPINION

Sharon McCally, Justice

In this real estate valuation dispute, appellants Michael Silberstein, Individually, Michael R. Silberstein Investments, Ltd., Magic Home Investments, Ltd., and Annette Silberstein[1] challenge the jury's determination of the fair market value of ten homes that were sold at foreclosure sales by appellee Trustmark National Bank f/k/a Republic National Bank. The Silberstein parties assert that the trial court reversibly erred by failing to define the term "fair market value" in the jury charge, that the evidence is insufficient to support the jury's fair market value determinations, and that the trial court erred in admitting the testimony of Trustmark's valuation expert. Because we determine that the jury's findings are not supported by factually sufficient evidence, we reverse and remand for a new trial.

---

**1.** For convenience sake, we generally will refer to appellants collectively as the "Silberstein parties" unless otherwise stated.

**2.** These properties are: 5807 Darlinghurst, 14222 McCadden, 3814 Ripplebrook, 3111 Tidewater, 92 W. Park West, 12947 Ambrose, 5367 Glen Rio, 4019 Heatherbloom, 3810

## I. BACKGROUND

This appeal concerns the jury's valuation of ten residential real properties sold through a foreclosure sale by Trustmark Bank.[2] These properties were owned by Michael R. Silberstein, his former wife Annette, and two businesses they operated: Michael R. Silberstein Investments, Ltd. (Silberstein Investments) and Magic Homes Investments, Ltd. (Magic Homes). These properties were single family homes used as income properties by the Silberstein parties located in the Hiram Clark area of Houston. These properties secured, through deeds of trust, two promissory notes that originated with Republic Bank, acquired through succession by Trustmark.[3] One of these notes was in Michael's name, individually and d/b/a Silberstein Investments; the other was in the name of Michael and Annette, individually and d/b/a Magic Homes. These notes were renewed or extended on several occasions, and both provided for cross-collateralization of the properties securing them. In other words, the properties securing the notes were considered to be "one pool of collateral" securing both notes.

In February 2011, Michael attempted to renew these notes, which were in default because the cash flow from the properties was inadequate to service them. After negotiations, Trustmark sent Michael a "Change in Terms Agreement" and "Extension of Real Estate Note and Lien" for each of the notes. Both proposed note extensions contained a waiver of the borrower's right to have a determination of

Heatherbrook, and 3442 Windy Royal. They are all located in Harris County.

**3.** Other properties also secured these loans, but these properties were not part of the foreclosure sales at issue in this appeal.

"fair market value" in case of foreclosure; Michael refused to sign the agreements and the notes because of this waiver provision.

Michael, Silberstein Investments, and Magic Homes sued Trustmark in anticipation of a foreclosure action by Trustmark; Trustmark counterclaimed for amounts due under the notes against Michael, Silberstein Investments, Magic Homes, and Annette. After Trustmark foreclosed on the ten properties, the Silberstein parties, through an amended petition and motion, sought a determination of fair market value and other relief. Ultimately, the case was tried to a jury on, as is relevant here, the issue of the fair market value of the properties as of the date of the foreclosure.

Trustmark was the winning bidder at the foreclosure sales of the ten properties. In calculating the amounts to bid at the foreclosure sales, Trustmark prepared a spreadsheet containing a valuation of each property from the Harris County Appraisal District (HCAD), a comparable sales valuation from an appraiser hired by Trustmark, and a valuation based on a calculation using the total annual rental income multiplied by various capitalization rates.[4] The cap rate represents the expected or intended return on the investment. A higher cap rate produces a lower value and vice versa. Trustmark's spreadsheet included cap rate valuations using the expected gross annual income generated by each property divided by three different cap rates: 12%, 15%, and 20%. According to the spreadsheet, Trustmark chose a foreclosure bid for each property that matched the 20% cap rate valuation.

At trial, Michael, the designated expert for the Silberstein parties with over 30 years' experience in buying, selling, and renting income properties in the Houston area, provided income-valuation evidence using his own calculated net income for each property.[5] Under the income approach, the expected net income from the property (expected annual income less expenses) is divided by a cap rate to produce a market value. Michael used an 8% cap rate; he testified that, based on his experience, 8% was a fair rate to use in the area rental market at that time. Michael validated two spreadsheets produced as evidence to the jury that summarized his opinions regarding the fair market value of the properties at issue. These spreadsheets indicated Michael's opinions as to the fair market values using an income value approach at the time of the foreclosure were as follows:[6]

---

4. Trustmark did not foreclose on any collateralized properties that were under a contract for deed. Additionally, one of the properties, 5367 Glen Rio, was not included in this spreadsheet because Michael informed Trustmark that it was under such a contract. Trustmark discovered shortly before the deadline for posting the foreclosure sale that the Glen Rio property was vacant, however, so Trustmark foreclosed on this property, as well.

5. Michael took the annual rental income from each of the properties, less payments for insurance, taxes, and homeowner's association dues to determine an annual net income. Based on his experience, Michael also adjusted this figure downward by 10% to cover maintenance and vacancy contingencies. Trustmark, on the other hand, simply used the gross income figures provided by Michael in calculating its income valuation figures.

6. These numbers have been rounded to the nearest whole dollar amount.

| | |
|---|---|
| 5807 Darlinghurst | $90,834 |
| 14222 McCadden | $80,099 |
| 3814 Ripplebrook | $76,210 |
| 3111 Tidewater | $92,917 |
| 92 W. Park West | $70,113 |
| 12947 Ambrose | $94,868 |
| 4019 Heatherbloom | $80,870 |
| 3810 Heatherbrook | $74,737 |
| 3442 Windy Royal | $80,606 |
| 5367 Glen Rio | $94,334 |

Trustmark's third-party appraiser and expert, George Langford "Ford" Bradley, a general certified appraiser for the State of Texas with over twenty years' experience in appraisals, testified regarding the fair market values of the subject properties based on the comparable sales approach provided in appraisals of each of the properties.[7] These appraisals were performed on the properties about three months before the properties were sold at the foreclosure sale, with the exception of one property for which his company retrospectively provided an appraisal. Bradley described comparable sales approach to valuation as looking at recent sales of comparable properties to determine the value of the properties at issue. Bradley acknowledged that many of the comparable sales used in arriving at the valuations to which he testified had resulted from foreclosure sales. The Silberstein parties introduced evidence that several of these comparable properties had been sold either before or shortly after the foreclosure sale at significantly higher prices than the sales prices used in the appraisals. Further, the appraisals for each property were admitted into evidence. On each appraisal, the appraiser also provided a cost basis valuation for each property. Bradley explained that the "[c]ost approach is the approximate value of the site with the approximate cost to reconstruct the dwelling." He acknowledged that to arrive at this value, a square footage value to replace the dwelling is multiplied by the size of the home. Bradley further acknowledged that the price per square foot used to compute the cost approach in most of the appraisals was likely too low at $48 per square foot and that $60 per square foot was "probably" a better figure for "that type of product."

7. Pretrial, Michael moved to exclude the expert testimony of Bradley because the data he used was not current, i.e., the data did not reflect sales of some of the comparable properties that occurred during the time between the date of the appraisals—June 2, 2011—and the date of the foreclosure sale of the subject properties—August 2, 2011. At a pretrial hearing, the trial court denied this motion, concluding the timeliness of the data was a fact issue.

The jury was provided with the following valuations of the properties: [8]

| Property | Michael's Income Valuation | Appraisal Comp. Sales Value | Appraisal Cost Basis Value |
|---|---|---|---|
| 5807 Darlinghurst | $90,834 | $30,000 | $56,686 |
| 14222 McCadden | $80,099 | $30,000 | $49,174 |
| 3814 Ripplebrook | $76,210 | $30,000 | $44,904 |
| 3111 Tidewater | $92,917 | $31,000 | $55,790 |
| 92 W. Park West | $70,113 | $35,000 | $50,449 |
| 12947 Ambrose | $94,868 | $30,000 | $55,302 |
| 5367 Glen Rio | $94,334 | $35,000 | $65,194 |
| 4019 Heatherbloom | $80,870 | $27,000 | $55,389 |
| 3810 Heatherbrook | $74,737 | $40,000 | $60,766 |
| 3442 Windy Royal | $80,606 | $28,000 | $53,935 |

In addition, Trustmark entered its spreadsheet into evidence showing the various cap rates it considered in determining its foreclosure bid amount, as well as the annual rent for each property. The relevant information for the properties contained on this spreadsheet is as follows: [9]

| Property | Annual Rent | 12% CAP | 15% CAP | 20% CAP |
|---|---|---|---|---|
| 5807 Darlinghurst | $9,000 | $82,500 | $66,000 | $49,500 |
| 14222 McCadden | $8,400 | $70,000 | $56,000 | $42,000 |
| 3814 Ripplebrook | $8,100 | $67,500 | $54,000 | $40,500 |
| 3111 Tidewater | $9,600 | $80,000 | $64,000 | $48,000 |
| 92 W. Park West | $9,600 | $80,000 | $64,000 | $48,000 |
| 12947 Ambrose | $9,600 | $80,000 | $64,000 | $48,000 |
| 4019 Heatherbloom | $9,300 | $77,500 | $62,000 | $46,500 |
| 3810 Heatherbrook | $8.700 | $72,500 | $58,000 | $43,500 |
| 3442 Windy Royal | $8,400 | $70,000 | $56,000 | $42,000 |

As is shown by comparing the two tables above, Michael provided income valuations

8. Michael's 8% income valuation was based on net income.

9. Trustmark used the properties' expected gross annual rent as provided by Michael. Also, the bank's spreadsheet did not contain information on the Glen Rio property because, as noted above, at the time it was prepared, Trustmark was unaware that it would be foreclosing on this property. However, Trustmark's foreclosure bid on Glen Rio matched a 20% cap rate multiplied by the property's anticipated gross annual rent.

for each property that were higher than the cap rate calculations provided by Trustmark and the comparable market and cost basis values estimated by Trustmark's appraiser. At the foreclosure sale, Trustmark successfully bid on each property using figures that coincided with those arrived at using a 20% cap rate multiplied by the properties' estimated gross income for one year.

The parties stipulated to the loan balances due at the time of the foreclosure sale, and both sides rested. The Silberstein parties moved, inter alia, for a directed verdict "because there is no competent evidence of market value as of August 2nd, 2011, as a matter of law." This motion was denied, and after both sides made closing argument, the jury was asked to determine "the fair market value of the ten properties . . . as of August 2, 2011." The jury was instructed that it must "determine the fair market value as of the date of foreclosure." The term "fair market value" was not defined in the charge, over Michael's objection and proffered instruction. The jury determined the fair market value of each property, establishing values for each property identical to the foreclosure bids made by Trustmark. Based on the jury's verdict and the stipulation regarding the loan balances, the trial court signed a judgment in favor of Trustmark on the Silberstein parties' deficiency on both loans for a total amount of $279,765.50.[10] The trial court further ordered attorney's fees in favor of Trustmark of $74,864.46 for trial, as well as conditional appellate fees. The trial court

ordered that the Silberstein parties take nothing on their counter claims.[11]

From this judgment, the Silberstein parties timely appeal.

## II. Sufficiency of the Evidence

■ In their second issue, which we address first as it contains a potential rendition point,[12] the Silberstein parties assert that the evidence is legally and factually insufficient to support the jury's verdict. The Silberstein parties make three principal arguments in their sufficiency issue: first, they assert that Trustmark's bid prices at the foreclosure sale were no evidence of fair market value; second, they urge that the appraisals prepared by Trustmark's expert witness and his testimony provided neither legally or factually sufficient evidence of fair market value; and third, they contend that the jury's finding of fair market value in the exact amount of Trustmark's foreclosure bids was against the great weight and preponderance of the evidence. After setting out the appropriate standard of review, we address the Silberstein parties' complaint regarding Trustmark's expert witness's testimony. We conclude that there is factually insufficient evidence to support the jury's valuation findings.

### A. Standard of Review

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary ev-

---

**10.** Annette failed to appear at trial; the trial court signed a judgment against her, jointly and severally with Michael and Magic Homes Investments, for the $122,397.86 deficiency on the note to which she was a party.

**11.** The Silberstein parties timely filed a motion for new trial challenging the factual sufficiency of the evidence.

**12.** *See Bradley's Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex.1999) (per curiam) ("Generally, when a party presents multiple grounds for reversal of a judgment on appeal, the appellate court should first address those points that would afford the party the greatest relief").

idence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex.2005). Where, as here, a party attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). We must first examine the record for evidence that supports the finding; if there is no evidence to support the finding, then we examine the entire record to determine if the contrary position is established as a matter of law. *See id.* We may sustain the issue only if the contrary position is conclusively established. *Id.* The jury is the only judge of witness credibility and the weight to give to a witness's testimony. *See City of Keller*, 168 S.W.3d at 819.

When considering a factual sufficiency challenge to a jury's verdict, we must consider and weigh all of the evidence, not just the evidence that supports the verdict. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998). We may only set aside the verdict if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Id.* at 408. We are not a fact finder; thus we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Id.*

**B. Competent Evidence of Fair Market Value**

■ The term "fair market value" as used in Texas Property Code section 51.003 is not statutorily defined. See Tex. Prop. Code Ann. § 51.0001. However, market value has been defined in other contexts as "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex.2001); *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 246 (Tex. 1981); cf. Tex. Tax Code Ann. § 1.04(7) (defining, for Tax Code purposes, "market value" in similar terms). This court and our sister court have used the same definition for "fair market value" under Texas Property Code section 51.003. *See Village Place, Ltd. v. VP Shopping, LLC*, 404 S.W.3d 115, 133 (Tex.App.–Houston [1st Dist.] 2013, no pet.); *Preston Reserve, L.L.C v. Compass Bank*, 373 S.W.3d 652, 658 (Tex.App.–Houston [14th Dist.] 2012, no pet.). "The three traditional approaches to determining market value are the comparable sales method, the cost method, and the income method." *Cf. City of Harlingen*, 48 S.W.3d at 182 (discussing market value in the contest of a condemnation proceeding).

Recently, the Texas Supreme Court explained:

[T]he enumerated factors in § 51.003(b) will support a fair market value finding under the statute even though that type of evidence might not otherwise be competent in the common or historical fair market value construct. That being so, the term "fair market value" in § 51.003 does not equate precisely to the common, or historical, definition. Rather, it means the historical definition as modified by evidence § 51.003(b) authorizes the trial court to consider in its discretion to the extent such evidence is not subsumed in the historical definition.

*PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 556–57 (Tex.2015). In turn, the types of competent evidence enumerated in section 51.003 include, without limitation, the following:

(1) expert opinion testimony; (2) comparable sales; (3) anticipated marketing

time and holding costs; (4) cost of sale; and (5) the necessity and amount of any discount to be applied to the future sales price or the cashflow generated by the property to arrive at a current fair market value.

*Id.* Thus, section 51.003(b) provides guidance regarding the types of competent evidence that the finder of fact may consider when determining fair market value in a suit to recover a deficiency; evidence that may modify the historical definition of fair market value. In this particular case, the only expert testimony regarding fair market value includes the traditional types of evidence of fair market value: comparable sales, cost method, and income method.

 The comparable sales approach has "long been favored" by courts in determining market value. *City of Harlingen*, 48 S.W.3d at 182 (noting that, when "comparable sales figures are lacking or the method is otherwise inadequate as a measure of fair market value, courts have accepted testimony based on the cost approach and the income approach"). Comparable sales must be voluntary, occur near in time to the disputed transaction and in the same vicinity as the subject property, and involve land with similar characteristics to provide competent evidence of value. *See id.* The cost approach looks to the cost of replacing the property and "tends to set the upper limit of true market value." *See id.* (internal quotation and citation omitted). "Finally, the income approach to value is appropriate when property would, in the open market be priced according to the income that it already generates." *Id.* This approach involves estimating future income and applying a cap rate to allow the appraiser to

arrive at a present value for the income-producing property. *Id.*

With these principles in mind, we turn to the sufficiency of the evidence to support the jury's findings.[13]

### C. Sufficiency of the Evidence

 Michael, the Silberstein parties' designated expert, testified as to the fair market value of the ten properties at issue. His testimony, summarized above, was based on the income approach to valuation. Because the Silberstein parties used these properties for income generation, the income approach to valuation was appropriate. *See City of Harlingen*, 48 S.W.3d at 182; *see also* Tex. Prop. Code Ann. § 51.003(b). As noted above, Michael provided the expected gross annual income for each property and adjusted it downward to accommodate for various expenses. He testified that, in his opinion, these adjustments were accurate based on his years of experience in the single family home rental arena. He further testified that he believed a fair cap rate for the industry at the time of the foreclosure sales was between 6 and 10%; he thus used a cap rate of 8%. He testified regarding the various publications he looked at to compare cap rates, which involved cap rates for commercial properties. He stated that the prevailing cap rate for commercial properties at the time of the foreclosure was approximately 6%, and he adjusted his cap rate to 8% to reflect that his properties were not commercial properties. We conclude that Michael's income-approach testimony is probative evidence of fair market value.

 Conversely, Trustmark's comparable sales approach evidence is not probative evidence. Specifically, as outlined

---

**13.** Because, as explained below, we conclude that the evidence is factually insufficient to support the jury's findings under the charge as given, we have not reached the Silberstein parties' issue regarding jury charge error.

above, Trustmark presented expert witness Ford Bradley to testify regarding the fair market value of each property using this methodology. Bradley explained that appraisers under his supervision had prepared appraisals for each property using, inter alia, the comparable sales approach. He provided the comparable sales valuations, detailed above, as determined by the appraisers for each property. However, on cross-examination, Bradley acknowledged that for many of the appraisals, the comparable sales used were actually foreclosure sales. Indeed, our review of the record indicates that of the ten appraisals performed, six of the properties were appraised using foreclosure sales as comparable sales. None of these appraisals indicate that any adjustments were made to account for the fact that these sales were not between willing sellers and willing buyers, nor did Bradley testify that any such adjustments were made.

 "Expert appraisal witnesses are subject to the same relevance and reliability standards that apply to all expert witnesses." *Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 829 (Tex.2014). If, as is relevant here, the basis for the expert opinion offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is an objection. *Id.* The evidentiary value of expert testimony arises from its basis, not from the mere fact that the expert has said it. *See, e.g., Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex.2012); *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004).

The properties appraised using the comparable sales approach based on two or more foreclosure sales were: 5807 Darlinghurst, 14222 McCadden, 3814 Ripple-brook, 92 W. Park West, 3810 Heatherbrook, and 5367 Glen Rio. Using these involuntary sales in determining the market value of these properties under the comparable sales approach provides no support to Bradley's opinions regarding their fair market value under this valuation approach. *Cf. City of Harlingen*, 48 S.W.3d at 182 (stating that, in determining fair market value in the context of condemnation proceedings, comparable sales must be voluntary); *see also Mel Acres Ranch*, 443 S.W.3d at 829; *Preston Reserve, L.L.C.*, 373 S.W.3d at 663 (noting that evidence of a foreclosure sales price is not competent evidence of fair market value because the transaction is not a free one between a willing seller and a willing buyer). Because the basis offered for Bradley's opinions of these properties' fair market values provides no support, his opinions were merely conclusory statements that do not constitute probative evidence of market value. *See Mel Acres Ranch*, 443 S.W.3d at 829.

We have determined that Bradley's comparable-sales testimony is no evidence to support the jury's fair market value findings as to six of the properties at issue. Thus, we must next determine whether the contrary position—i.e., Michael's asserted fair market valuations—was established as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241 (a legal sufficiency challenge to an issue on which the challenger bears the burden of proof may only be sustained when there is no evidence to support the finding *and* the contrary position is conclusively established).

Here, as is noted above, Bradley also provided testimony about the appraisals, which contained cost-basis valuations for the properties. During cross-examination of Bradley, the Silberstein parties challenged the price per square foot replace-

ment value for the dwellings used in many of the appraisals:

> Q. And are you seriously telling the ladies and gentlemen of the jury that in June 2nd, 2011, in this case a 1226 square foot house with three bedrooms could be rebuilt for $48 a square foot with plumbing, with carpet, with electricity? Is that what you're telling the jury?
>
> A. Basically, if it was built by volume home builder, yes, and these were tract style home, so, yes.

This testimony was supported by the appraisals, which reflected replacement cost prices per square foot ranging from a low of $30 to a high of $73. We thus conclude that there was some competent evidence of cost basis valuations for the properties at issue in this case. *See* Tex. Prop. Code Ann. § 51.003(b); *City of Harlingen*, 48 S.W.3d at 182.

Because we determine that there was no single fair market value for each property, but instead a *range* of fair market values from the low established by the cost basis valuations to the high established by Michael's income valuations, Michael failed to establish his position as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241. In other words, based on this evidence, the jury reasonably could have selected a fair market value between the cost basis and the income valuations—within the range of competent evidence. *See, e.g., Preston Reserve, L.L.C.*, 373 S.W.3d at 666 (explaining that "[a]lthough a factfinder is not bound to accept valuation expert testimony, it cannot 'leap entirely outside of the evidence in answering' a valuation question" (quoting *Callejo v. Brazos Elec. Power Co–Op., Inc.*, 755 S.W.2d 73, 75 (Tex. 1988)).

However, because the jury's findings regarding the fair market value for these six properties was not within the range of competent evidence, we conclude that the jury's findings are contrary to the overwhelming weight of the evidence and are clearly wrong and unjust.[14] *See Mar. Overseas Corp.*, 971 S.W.2d at 408; *see also Preston Reserve, L.L.C.*, 373 S.W.3d at 666 ("A factfinder is allowed to set the value at any amount between the lowest and highest values by the evidence."). This is especially so in light of the fact that Bradley himself retreated from his above-quoted testimony and agreed that a more reasonable price per square foot for "that type of product" would be "60" per square foot. Thus, the evidence is factually insufficient to support the jury's findings.

Accordingly, we sustain in part the Silberstein parties' second issue. We set aside the jury's findings as to the fair market values for these properties. And because all of the properties secured both promissory notes as a "pool of collateral," we are unable to suggest a remittitur.[15]

### III. CONCLUSION

Having sustained the Silberstein parties' factual sufficiency complaint, we reverse

---

**14.** Trustmark urges that, because Texas Property Code section 51.003 "does not limit the type of evidence the [factfinder] can consider in determining fair market value, it is not clear whether evidence of bid amounts or foreclosure sale prices would not be competent evidence under the statute." But section 51.003 is designed to permit a party who has been non-judicially foreclosed upon to seek a fair market determination in an effort to offset any deficiency between the foreclosure sale price of the property and the unpaid balance of the indebtedness secured by the property. *See* Tex. Prop. Code Ann. § 51.003(a). Thus, it strains credulity to posit that the legislature intended a foreclosure bid or foreclosure sales price to be competent evidence of fair market value under this statute.

**15.** We note, however, that four of these properties are listed as collateral for one note and two are listed as collateral for the other.

and remand to the trial court for proceedings consistent with this opinion.