# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00606-CV

---

**Robert Penta, Appellant**

**v.**

**Easy Street Capital, LLC, Appellee**

---

### FROM THE 126TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-20-002334, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

After a bench trial, Robert Penta appeals from the judgment awarding Easy Street Capital, LLC, (ESC) recovery on a personal guaranty of a loan for a real-estate purchase. ESC sought to recover a deficiency remaining on the note after ESC's foreclosure sale of the property. Penta challenges the trial court's admission of ESC's expert's testimony on fair market value, the conclusion that ESC's delinquency fee is not usurious interest, the denial of Penta's affirmative defense of settlement and compromise, and the amounts awarded for fair market value, interest, and total deficiency. We will modify the judgment in part and affirm the judgment as modified.

## BACKGROUND

Penta bought improved real property on Greenwood Avenue in Austin, Texas, in February 2018, intending to resell the property. ESC loaned Penta the purchase price plus amounts for renovation, equaling a total of $790,000 available to be drawn. Penta made a Note to ESC secured by the property and Penta's personal guaranty. Interest of 11.9% annually was

due and payable monthly beginning April 1, 2018, and continuing until March 1, 2019, when the entire balance of the loan was due and payable. Payments made 10 days or more late prompted a delinquency charge of 5% of the unpaid portion of the scheduled payment. Additionally, if the outstanding principal balance was not paid within 10 days of the maturity date, ESC would assess a delinquency charge of 5% of the outstanding principal balance (plus all accrued but unpaid interest); Penta and ESC expressly agreed in the Note "that the charges set forth herein are reasonable compensation to [ESC] for the handling of such late payments."

ESC's February 28, 2019 billing statement showed a principal balance of $512,277.19[1] and a total balance of $523,690.98, which included unpaid interest amounts from previous months. (Penta made $59,504.17 in interest payments during the loan period.) When Penta failed to pay the balance due by March 10, 2019, ESC accelerated the Note and demanded payment. When Penta failed to pay, ESC sent notice of foreclosure.

Penta obtained a temporary restraining order against the foreclosure sale on May 3, 2019. On May 16, 2019, the parties entered a Rule 11 Settlement Agreement (Rule 11 agreement) in "final settlement" of Penta's claims against ESC, which included claims for breach of contract and fraud. ESC agreed not to foreclose on the property until August 6, 2019. Penta agreed to release all claims alleged against ESC and to dismiss his injunction suit, not to seek any injunction against an August foreclosure, and not to file bankruptcy to discharge the Note. Penta agreed that the payoff for the note would include all unpaid principal, all unpaid interest at the original unmatured rate, and collection costs to date.

---

[1] Penta testified that he paid $500,000 for the property. ESC's indebtedness calculation summary lists "initial funding" on the date of purchase as $400,000, followed by $112,277.19 in principal draws.

ESC foreclosed on the property on August 6, 2019, and bought the property at the sale for $513,000. ESC partner Casey Denton testified that this amount included ESC's estimate of the fair market value plus $27,000 in back taxes. ESC then made minor improvements to the property and sold the property as two parcels to third parties for $523,021.58 in January 2020. ESC's summary of indebtedness allocated $198,464.50 in value to 1181 Greenwood and $324,557.08 in value to 1183 Greenwood.

ESC sued to recover amounts not recovered through the sale. After a bench trial, the court found that Penta owed ESC $114,955.43 in damages, $61,605 in attorney's fees, $6,932.89 in costs, prejudgment interest at 18%, plus post-judgment interest at 5%.

## DISCUSSION

Penta contends that the trial court abused its discretion by admitting expert testimony, determining the fair market value of property, determining that he owed interest, concluding that the delinquency fee is not usury, denying his affirmative defense of settlement and compromise, and determining the amount of the deficiency.

**Fair market value and expert testimony of fair market value**

By issue two, Penta contends that the trial court abused its discretion in determining the fair market value of the property. By issue one, he contends that the trial court abused its discretion by admitting ESC's expert's testimony about the fair market value of the property at the time of foreclosure and by finding that value was $520,000.

Because the foreclosure sale price was less than the unpaid balance of the indebtedness secured by the real property, ESC alleged a deficiency existed and sought to recover the deficiency through Penta's guaranty of the loan. In response, Penta asked the trial

3

court to determine the fair market value of the real property as of the date of the foreclosure sale pursuant to Texas Property Code § 51.003(b). That section provides:

> The fair market value shall be determined by the finder of fact after the introduction by the parties of competent evidence of the value. Competent evidence of value *may include, but is not limited to*, the following: (1) expert opinion testimony; (2) comparable sales; (3) anticipated marketing time and holding costs; (4) cost of sale; and (5) the necessity and amount of any discount to be applied to the future sales price or the cashflow generated by the property to arrive at a current fair market value.

Tex. Prop. Code § 51.003(b) (emphasis added). If the fair market value at the time of foreclosure exceeds the actual price paid at the foreclosure sale, the former property owner is entitled to an offset of that excess against any award of a deficiency in the foreclosure-sale proceeds used to satisfy the amount of indebtedness remaining. *Id.* § 51.003(c). The Legislature did not expressly define the term "fair market value" in § 51.003 but indicated the meaning by listing the types of evidence that can show fair market value. *PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 556 (Tex. 2015).

The factfinder can reasonably select a fair market value that is within a range of competent evidence of values in evidence. *Silberstein v. Trustmark Nat'l Bank*, 533 S.W.3d 403, 413 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *Preston Reserve, L.L.C. v. Compass Bank*, 373 S.W.3d 652, 666 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *State v. Huffstutler*, 871 S.W.2d 955, 959 (Tex. App.—Austin 1994, no writ)). As long as a rational basis for the calculation of damages exists, a finding will not be disregarded merely because its reasoning in arriving at its figure may be unclear. *Pleasant v. Bradford*, 260 S.W.3d 546, 559 (Tex. App.—Austin 2008, pet. denied). Only if the value lies outside the range of testimony will we find the evidence fails to support the verdict. *Callejo v. Brazos Elec. Power Co–op., Inc.*,

4

755 S.W.2d 73, 75 (Tex. 1988). A factfinder is not bound to accept valuation expert testimony. *Preston Reserve*, 373 S.W.3d at 666 (citing *Callejo*, 755 S.W.2d at 75).

The trial court admitted ESC's expert's testimony and valuation, Penta's valuation based on the Travis Central Appraisal District's (TCAD's) appraised values; [2] Penta's February 2018 purchase price; the actual August 6, 2019 foreclosure-sale price; and the January 2020 sale prices of the individual lots. The trial court's finding of a fair market value on August 6, 2019, of $520,000 is within the extremes of the values proffered by ESC's expert ($436,000) and Penta (over $1 million). It is more than Penta's 2018 purchase price ($500,000), more than the foreclosure sale price ($513,000), but slightly discounted from the combined sale price[3] in January 2020 ($523,021.58).

The trial court reasonably departed from the valuations from the parties' witnesses. No evidence explained the basis for TCAD's valuation on which Penta based his valuation. The TCAD values consistently departed from the prices paid by buyers—including Penta. In 2018, when TCAD valued the property at $989,191, Penta paid $500,000 for it. In 2019, when TCAD valued it at $1,037,914, the property sold for $513,000 at the August 2019 foreclosure sale. Though Penta claimed he "would have sold it for over a million dollars," he did not sell it despite holding the property for 18 months. Penta listed the 1181 Greenwood Avenue

---

[2] Penta testified that the property's value at the time of foreclosure was over a million dollars because TCAD "had it appraised for over a million dollars, and I would have sold it for over a million dollars." TCAD valued the property at $989,191 in 2018 and at $1,037,914 in 2019.

[3] The property sold as two lots to different buyers. 1183 Greenwood Avenue sold for $198,464.50 on January 24, 2020, and 1181 Greenwood Avenue sold for $324,557.08 on January 29, 2020. In 2021, TCAD valued 1183 Greenwood at $415,100 and 1181 Greenwood at $635,499 for a combined value of $1,050,599.

lot for $649,000 in 2019 but was unable to sell it for that amount; Penta testified he could not recall if he received an offer at that price. The property sold as two parcels to third parties in January 2020 for a combined $523,021.58. The discrepancies between the TCAD values and what any of the three buyers paid for the property between 2018 and 2020 support the trial court's rejection of TCAD's valuation as establishing the fair market value for this property. Similarly, the trial court was not bound to accept ESC's expert's valuation of the property that was several thousand dollars below the contemporaneous sales prices.

The trial court did not explain the basis for its finding of fact that the fair market value of the property was $520,000 at the time of the foreclosure sale, but the court could reasonably have relied on evidence of the sales prices to Penta eighteen months before and to third parties five-and-a-half months after the foreclosure. Penta argues that the record lacks evidence that the market conditions between the foreclosure sale and the January 2020 sale were comparable or evidence that justified its discount of $3,021.58 from the January 2020 sale. He contends that the market conditions were different because the January 2020 sale split the property, while the foreclosure sale transferred them as a package. The Texas Supreme Court, however, has held that requiring parties to show comparable market conditions between the foreclosure sale and the future sale "would be adding words to § 51.003. We refuse to do that in the absence of clear legislative intent to reach a different result from that reached by applying the plain language of the statute, or to prevent the statute from yielding an absurd or nonsensical result." *Martin*, 459 S.W.3d at 556. The trial court could reasonably have credited Penta with some improvements or looked at the rate of increase of the value between Penta's February 2018 purchase and the third-party buyers' January 2020 purchase price—an increase of $23,021.58, or roughly a $1,000 monthly increase across 23 months. The trial court's discount of $3,021.58

from the January 2020 sale to the foreclosure-sale date five-and-a-half months earlier is less than that $1,000 per month rate, thus assessing a value higher than the straight-line rate of increase. The trial court was not presented with a binary choice between values. Evidence corresponding to the precise amount found is not essential to withstand an evidentiary-sufficiency challenge. *See Pleasant*, 260 S.W.3d at 559. Because the trial court found a fair market value within the range of the values in evidence, we cannot disregard its finding merely because its reasoning in arriving at its figure is not completely clear. *Id.*; s*ee also Silberstein*, 533 S.W.3d at 413.

Because that reasonable value was within a close range of purchase prices independent of ESC's expert's value, we need not address whether the trial court erred by admitting ESC's expert's testimony because the court appears to have disregarded that value. *See* Tex. R. App. P. 47.1. We overrule issue two and do not reach issue one.

**Interest**

By issue three, Penta contends that the trial court erred by determining that he owed $47,641.68 in interest after he was declared in default. Penta challenges only the application of the default interest rate for interest that accrued in February 2019 before he was declared in default in March 2019. We look to the four corners of the Note to determine if it states unambiguously how the interest should have been calculated. *See EMC Mortg. Corp. v. Davis*, 167 S.W.3d 406, 413 (Tex. App.—Austin 2005, pet. denied).

The Note provides that, until maturity, the loan balance bears an interest rate of 11.9%. Interest was due and payable monthly as it accrued "until 3/1/2019, when the entire balance hereof, principal and accrued interest remaining unpaid, shall be then due and payable."

Matured, unpaid principal and interest bears interest "from maturity until paid, at the Maximum Rate" which was 18%—the statutory ceiling set by Texas Finance Code § 303.009.

Penta did not make the payment due on March 1, 2019. Penta contends that the trial court abused its discretion by applying the 18% rate to interest that accrued in February and that this Court should either modify the judgment or remand to the trial court to adjust the amount of interest. ESC contends that the trial court correctly calculated the interest due in March to "retroactively" bear the 18% rate because Penta failed to pay the daily interest that accrued starting on the date of his last payment on February 1, 2019. Penta does not dispute that he was in default beginning in March 2019 and does not dispute that he remained in default. The only dispute is when the 18% interest rate was properly first applied.

The Note was not mature before March 1, 2019. ESC's Denton testified that "March 2019 is when [Penta] first defaulted." No evidence shows that ESC accelerated the maturity of the Note before the missed March 2019 payment. Under the plain terms of the Note, interest accrued "until maturity, on the balance of that principal sum advanced and remaining unpaid, at the rate of eleven and 90/100 percent (11.90%) per annum," calculated on the basis of a 360-day year. The Note matured on March 1, 2019, so the heightened interest rate was triggered on that maturity date. We conclude that the trial court erred by assessing the contractual 18% interest rate on the amounts from February 2019 that were due and payable on March 1.

We sustain issue three. Using the formula prescribed by the Note, we recalculate the interest assessed at 18% beginning on March 1, 2019, rather than February 1, 2019, and continuing up to the August 6, 2019 foreclosure using the 360-day method. The amount due and unpaid on the March 1, 2019 maturity date was $512,277.19. That amount, multiplied by the

8

18% annual interest rate for five months plus six days in August, divided by 360, yields $39,957.62 in interest rather than the $47,641.68 found by the trial court.

**Delinquency fee**

By issue four, Penta contends that the trial court erred as a matter of law by concluding that the delinquency fee of $25,613.85 is not considered interest for purposes of the usury prohibition and, accordingly, that ESC did not impose usurious interest above the statutory ceiling of 18%. To resolve this issue, we must explore the meaning and interplay of statutes concerning delinquency fees, interest, and usury.

Our objective in construing a statute is to ascertain legislative intent. *First Am. Title Ins. v. Combs*, 258 S.W.3d 627, 635 (Tex. 2008). We discern legislative intent from the statute's language because it is "'the truest manifestation' of what lawmakers intended." *Id.* (quoting *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006)). If statutory language is unambiguous, we will interpret and apply the statute according to its plain meaning unless a different meaning is apparent from the context or the plain meaning leads to absurd results. *In re Ford Motor Co.*, 442 S.W.3d 265, 280 (Tex. 2014) (orig. proceeding). In determining a statute's meaning, we consider the statute as a whole rather than construing specific provisions in isolation. *Id.* Undefined terms are therefore afforded their ordinary meaning unless a different or more precise definition is apparent from the context of the statute, *see* Tex. Gov't Code § 311.011(a); *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011), because we cannot give an undefined term a meaning that is disharmonious or inconsistent with other provisions in the statute, *see Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). If an undefined term has multiple common meanings, it is not

9

necessarily ambiguous; rather, we will apply the definition most consistent with the context of the statutory scheme. *Southwest Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 405 (Tex. 2016).

The Legislature has capped the amount of interest that a lender can charge on an installment loan at 18%, s*ee* Tex. Fin. Code § 303.009, and has permitted the assessment of delinquency charges calculated at up to and including 5% of the unpaid installment payment:

> In addition to the interest authorized by this chapter, the parties to a commercial loan may agree and stipulate for:
>
> (1)  a delinquency charge on the amount of any installment or other amount in default for a period of not less than 10 days in an amount not to exceed five percent of the total amount of the installment . . . .

*Id.* § 306.006. The Legislature defined interest as

> compensation for the use, forbearance, or detention of money. The term does not include time price differential, regardless of how it is denominated. The term does not include compensation or other amounts that are determined or stated by this code or other applicable law not to constitute interest or that are permitted to be contracted for, charged, or received in addition to interest in connection with an extension of credit.

*Id.* § 301.002(4).

Penta contends that the Legislature did not permit lenders to add 5% interest as a delinquency charge to the entire balance of the loan, essentially raising the maximum interest rate to 23%. He argues that the "installment" payment on which a delinquency charge can be assessed cannot be one that includes the entire principal. Because the Legislature did not define "installment," Penta cites dictionaries to find the common meaning of the term. He cites dictionary definitions of installment as "a sum of money due as one of several equal payments

10

for something, spread over an agreed period of time"[4] and "something that is less than the whole."[5]  He argues that the balloon payment that included the entire principal cannot satisfy these definitions.

We find no binding authority excluding a balloon agreement or a balloon payment from the definition of "installment."  Though some cases mention "installment" and "balloon payment" discretely,[6] those cases do not hold that the balloon payment is not an installment.  Other courts have treated the balloon payment as an installment payment of a different amount.  The Texarkana Court of Appeals described the payments for a land-purchase contract as "payable in twenty-three equal monthly installments of $354.64 each, with a final installment (a 'balloon' installment) equal to the then-remaining principal and interest due on the obligation."  *Gnerer v. Johnson*, 227 S.W.3d 385, 387 (Tex. App.—Texarkana 2007, no pet.).  The Tyler Court of Appeals described a repayment plan as follows:  "[T]he borrower was allowed to repay the loan in unequal monthly installments by making eleven monthly installment[s] of $200.00 and a final balloon installment of $9,671.34."  *Talbert v. First Nat'l Bank in Center*, 664 S.W.2d 126, 131 (Tex. App.—Tyler 1983, writ refused n.r.e.).  We consider the Legislature's silence to

---

[4]  Penta cited, "'Installment, n1.' Oxford English Dictionary Online, March 2022, https://www.google.com/search?q=installment+definition&rlz=1C1GCEU_enUS966US96 6&oq=installment+definition&aqs=chrome..69i57j0i512l3j0i22i30l6.3221j1j7&sourceid=chrom e&ie=UTF-8, Accessed 2 May 2022."

[5]  Penta cited,"*Installment. The Law Dictionary*, 2002, Anderson Publishing Company."

[6]  *See, e.g., CDB Software, Inc. v. Kroll*, 992 S.W.2d 31, 38 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (loan "payable in five-year installments, with a balloon payment due in May 1995"); *General Fin. Servs., Inc. v. Practice Place, Inc.*, 897 S.W.2d 516, 518 (Tex. App.— Fort Worth 1995, no writ) ("payable in quarterly installments, with a balloon payment due").

mean that the term "installment" is not limited to equal payments and does not exclude a balloon payment. Here, the payments due were eleven installments comprising interest plus no principal, followed by a twelfth payment comprising interest plus all principal.[7] We conclude that the balloon payment is an "installment" within the meaning of Texas Finance Code § 306.006(1).[8]

Penta argues that the delinquency charge is interest and, when added to the 18% interest charged upon his default, exceeds the maximum amount allowed. But the Note's terms fit the statutory parameters for allowable delinquency charges, which are not interest. As set out above, "interest" is "compensation for the use, forbearance, or detention of money" and not "compensation or other amounts that are determined or stated by this code . . . that are permitted to be contracted for, charged, or received in addition to interest in connection with an extension of credit." Tex. Fin. Code § 301.002(4). Delinquency charges are such a permitted non-interest charge. Parties to a commercial loan may agree to "a delinquency charge on the amount of any installment or other amount in default for a period of not less than 10 days in an amount not to exceed five percent of the total amount of the installment . . . ." *Id.* § 306.006. Penta and ESC reached such an agreement in the Note:

> If a payment is made 10 days or more late, Makers will be charged, in addition to interest, a delinquency charge of 5% of the unpaid portion of the regularly scheduled payment. Additionally, upon maturity of this Note, if the outstanding

---

[7] The fact that the delinquency charge can be assessed on the entire principal balance on the unpaid balloon payment does not alter our conclusion. In an agreement where installment payments were equal and included principal, the delinquency charge could have been assessed on the entire principal if the debtor made late payments on every installment including principal.

[8] Our conclusion is consistent with the holding of the Waco Court of Appeals in *Carter v. Ennis Paint, Inc.*, No. 10-13-00118-CV, 2014 WL 6091948, at *3 (Tex. App.—Waco Nov. 13, 2014, no pet.) (mem. op.). That court held that a 5% delinquency charge could be assessed against the entire amount due when a note was accelerated. *Id.*

principal balance (plus all accrued but unpaid interest) is not paid within 10 days of the maturity date, Makers will be charged a delinquency charge of 5% of the sum of the outstanding principal balance (plus all accrued but unpaid interest). Makers agree with Holder that the charges set forth herein are reasonable compensation to Holder for the handling of such late payments.

The provision meets the statutory parameters for when the charge can be assessed (when the payment was 10 days late), the amount that can be assessed (5% of the unpaid outstanding principal installment), and why it can be collected (as compensation for the handling of the late payment). *See id.* Because the delinquency charge is, by terms of the Note, a handling fee for late payments, the trial court did not err by concluding that the $25,613.85 was not interest and did not cause the Note to charge a usurious interest rate.

We overrule issue four.

**Settlement and compromise**

By issue five, Penta contends that the trial court erred as a matter of law by rejecting his affirmative defense of compromise and settlement that was based on the theory that the Rule 11 agreement controlled the amount of damages available to ESC. Penta bore the burden of proof on his affirmative defense. *See Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 593 S.W.3d 324, 333 (Tex. 2020); *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 156 (Tex. 2015). Accordingly, we will construe this issue as an assertion by Penta that he proved, as a matter of law, all vital facts in support of his affirmative defense. *RM Crowe Prop. Servs. Co., L.P. v. Strategic Energy, L.L.C.*, 348 S.W.3d 444, 448 (Tex. App.—Dallas 2011, no pet.).

When assessing a matter-of-law challenge, we first examine the record for evidence that supports the adverse finding, crediting favorable evidence if a reasonable factfinder

13

could, while disregarding all evidence to the contrary, unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005); *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). If there is no evidence to support the adverse finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law. *Dow*, 46 S.W.3d at 241. The issue will be sustained only if the contrary proposition is conclusively established. *Id.* When one or more elements of a cause of action have been found by the trial court in the court's findings of fact and conclusions of law, omitted unrequested elements, when supported by evidence, will be supplied by presumption in support of the judgment. Tex. R. Civ. P. 299. Thus, when the trial court makes express findings on at least one element of a claim, implied findings on the omitted unrequested elements are deemed to have been made in support of the judgment. *See Vickery v. Commission for Lawyer Discipline*, 5 S.W.3d 241, 252 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). It is the appellant's duty to attack the express and implied findings. *Long v. Long*, 234 S.W.3d 34, 42 (Tex. App.—El Paso 2007, pet. denied).

Penta contends that the trial court should have concluded that ESC breached the Rule 11 agreement by seeking in this lawsuit a deficiency based on costs and charges that accrued after the May 28, 2019 filing of the Rule 11 agreement. A breach-of-contract claim requires proof of (1) a valid contract, (2) performance of the contract by the claimant, (3) breach by the other party, and (4) damages to the claimant. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018).

14

The parties' disagreement centers on the meaning of the Payoff Provision, numbered paragraph 4 of the Rule 11 agreement.[9] In that provision, Penta agreed "that the payoff for Defendant's Real Estate Lien Note dated February 7, 2018 shall include all unpaid principal, all unpaid interest at the original unmatured rate, and collection costs to date." Elsewhere in the Rule 11 agreement, ESC agreed not to foreclose on the property until August 6, 2019. Penta agreed to dismiss the suit for injunctive relief, not seek an injunction against the August foreclosure, and not declare bankruptcy to avoid the debt to ESC. Penta did not attempt to enjoin the foreclosure, file bankruptcy, or pay off the Note.

Penta argues that the Rule 11 agreement limited his liability in exchange for him agreeing not to further delay the foreclosure or seek a bankruptcy stay. By contrast, ESC contends that the Rule 11 agreement defined a lower-cost amount to pay off the loan that Penta did not avail himself of and that the Note and its terms controlled the foreclosure sale and computation of the amount owed and the deficiency. Penta testified that he understood that the parties were resolving their disputes in the Rule 11 agreement and not merely delaying them. He argues that it would make no sense to merely delay the foreclosure without further concessions from ESC and to give up his right to injunctive or bankruptcy relief in exchange for nothing.

---

[9] Penta argues that the Rule 11 agreement is ambiguous. Ambiguity merely allows the court to consider evidence extrinsic to the contract and to consider extraneous matters to construe the provision. *See Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency*, 56 S.W.3d 313, 319 (Tex. App.—Houston [1st Dist.] 2001, no pet.). ESC contends that the trial court correctly found that the agreement was not ambiguous but does not cite where that finding occurred. We see no such finding in the judgment or findings of fact and conclusion of law. In open court, in context of a discussion of the parties' understanding of the meaning of the Payoff Provision, the trial court stated, "It—it doesn't say either of those things. But I understand that those are the specific things that you all think that it means."

For purposes of this opinion, we will assume without deciding that the agreement is ambiguous. Assuming ambiguity in favor of Penta does not alter our resolution of the appeal. *See* Tex. R. App. P. 47.1.

15

But Penta did not get nothing in exchange for his concessions. He gained a litigation-free delay of foreclosure for three months, during which he attempted to sell the property for an amount that would have recouped more than the foreclosure sale did. ESC extended a lower interest rate for the payoff in exchange for full payment of the Note without the expense of foreclosure. Penta did not exercise his right to pay off the Note at the lower rate. The record supports the trial court's implicit conclusion that, absent the payoff, ESC could pursue foreclosure under the previous agreements. The record does not demonstrate as a matter of law that ESC breached the Rule 11 agreement or that its terms affected the amounts ESC could recover through foreclosure when the foreclosure-postponement period expired.

We overrule issue five.

**Deficiency**

By issue six, Penta contends that the trial court erred in determining the amount of deficiency that existed as prescribed by Texas Property Code § 51.003. He reiterates his contentions (1) that the Rule 11 agreement limited his indebtedness under the Note to the unpaid principal, unpaid interest at the unmatured rate, and collection costs as of the date of the agreement; (2) that the trial court erred in determining the fair market value of the property; and (3) that the court erred in awarding the 5% delinquency charge. We will not revisit these arguments addressed above but note that the deficiency is reduced to address the reduced interest rate properly applicable in February 2019.

We sustain issue six to the extent that it concerns the erroneous award of interest at the higher rate for February 2019. Otherwise, we overrule issue six.

**CONCLUSION**

We modify the judgment by reducing the $47,641.68 in interest found by the trial court to $39,957.62. We further modify the judgment by reducing the damage award to $107,271.37. We affirm the judgment as modified.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Smith

Modified in Part, Affirmed as Modified

Filed: October 31, 2023