# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00535-CV

---

**Toan Ly, Appellant**

**v.**

**Hong Nguyen, Appellee**

---

### FROM THE 459TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-20-003420, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Toan Ly (Husband) appeals from the decree in the divorce from Hong Nguyen (Wife) and suit affecting the parent-child relationship (SAPCR). Husband contends that the trial court erred by failing to issue any findings of fact, conclusions of law, or ruling on the record after the trial; to allocate the parties' debt; or to consider that the marital property is in a floodplain. Husband also contends that the trial court erred by deviating from the child-support guidelines. We will reverse the part of the decree setting the amount of Husband's child-support obligation and remand that issue for further proceedings. All other challenged parts of the decree are affirmed.

## BACKGROUND

Though the evidence in the parties' divorce and SAPCR was wider-ranging, we will focus on the background for the central issues on appeal: debt, income, and property values.

The parties married in 2011, had a child in 2013, and purchased a house on about 3.6 acres for about $295,000 in 2014. They disagreed on the source of some of the funds for that purchase. The parties agreed that they obtained loans from Husband's brother ($60,000) and Home Sweet Home, LLC, a company owned by Husband's aunt ($130,000). Husband testified that he paid the remainder of the purchase price with loans from a friend ($38,000), his mother ($23,000), and their family doctor ($14,000); Husband introduced a bank statement from October 2014 showing various deposits, but the statement did not show the source of those funds. Husband said he repaid some of the personal loans after selling a separate property house for $161,000 in 2015; Wife rejected his assertion. Husband testified that they currently had a $50,000 mortgage. He also listed a $33,000 Small Business Administration loan among his debts on his proposed child-support worksheet. He said that he paid the mortgage with no help from Wife.

In 2016-17, Husband built a car-repair shop on the property. He estimated that it cost $200,000 to build and that he had added about $20,000 in improvements. He said that his sister wired him a loan of $215,000 in February and April of 2017; there are wire transfers to their bank account of about $50,000 in February 2017 and about $165,000 in April 2017, but the statements do not name the sender. Wife testified that her father transferred $215,000 to husband's bank account in 2017.

Wife testified that Husband never told her of any purchase loans aside from the loans from Home Sweet Home and his brother; she said that the couple paid the home purchase balance with their own cash. Wife testified that they eventually obtained a mortgage to pay off the Home Sweet Home loan and that nobody else contributed to the purchase of the shop or repayment of the debt. She testified that, "since the day that we purchase[d] the house, we did not owe anybody money. We did not borrow anybody's money from anybody." She testified

2

that the couple got a loan from Austin Telco to build the shop and that they still owe about $30,000 to $40,000 on that loan.

In April 2019, Husband wrote a $120,000 check to Wife with the memo line stating "loan repay." The check was not cashed. Husband testified that he did not remember his father-in-law giving them money for the shop and that he did not intend to repay any such loan when he wrote the check. Husband testified that his check was to help Wife repay loans she obtained to run a chicken farm in 2017 and 2018. Wife testified that when Husband wrote the $120,000 check he told her he was buying out her share of their home and property and that he wanted her to leave; she said she did not deposit the check because she knew the account did not have sufficient funds. She said that Husband told her he was angry when he wrote the check. She said she did not know why he wrote "loan repay" in the memo line.

The parties did not provide values for other properties divided in the decree. Husband testified that a recreational vehicle on the property was a gift from his mother to his younger brother, but Wife rejected that story and testified that the RV was in her name. No title or other proof of ownership was offered or admitted by either party.

The parties' experts provided widely differing values for the real property. Husband's expert, Steven Adams, set the value at $770,000. He set that value in May 2021, then revisited the property in September 2022 and estimated that the value was the same; he testified that property values had increased about 10% from May 2021 to May 2022, then decreased about 5% by September 2022. Wife's expert, Susan Briggs, valued the property at $1,040,000 in November 2021. She asserted that Adams undervalued the property because he did not consider the full added value of the enclosed garage and deducted from the house's value both for being in the floodplain and for having the basement flood. Briggs touted the property's commercial-

3

development potential due to its location. She also testified that values increased from May 2021 by 25%.

During the years 2018 through 2021, Husband reported to the Internal Revenue Service gross receipts for the car-repair business of at least $150,000 every year reduced by expenses and depreciation to profit/income of less than $22,000 every year. Wife reported making $48,000 for work at a chiropractor's office.

The court named the parties joint managing conservators of their child, imposed a modified expanded standard possession order, and gave Wife the exclusive right to designate the child's primary residence in Williamson or Travis counties. The court ordered Husband to pay $1,840 in monthly child support. The court awarded Husband the property containing the house and shop but required him to compensate Wife for her share of the property by paying her $498,042.07—which the court said was half the appraised value of the marital residence minus half the mortgage owed. No party timely requested findings of fact and conclusions of law, and the trial court did not make any.

**STANDARD OF REVIEW**

We apply an abuse of discretion standard of review to Husband's issues challenging the trial court's decisions regarding property division and child support. *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam); *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007).

In a bench trial to the court in which no findings of fact or conclusions of law are filed, we will infer all findings of fact necessary to support it. *Rosemond v. Al–Lahiq*,

4

331 S.W.3d 764, 766-67 (Tex. 2011). When (as here) a reporter's record is filed, these implied findings are not conclusive, and an appellant may challenge the legal and factual sufficiency of the evidence to support them. *See Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992).

Under an abuse-of-discretion standard, legal- and factual-sufficiency challenges to the evidence are not independent grounds of error, but are relevant factors in assessing whether the trial court abused its discretion. *Iliff v. Iliff*, 339 S.W.3d 126, 134 (Tex. App.—Austin 2009), *aff'd*, 339 S.W.3d 74 (Tex. 2011). In determining whether a trial court abused its discretion because the evidence is insufficient to support the decision, we look first to whether the court had sufficient evidence upon which to exercise its discretion and then to whether the court erred in his application of that discretion. *Id*.

Evaluating whether legally sufficient evidence supports a challenged finding requires that we examine the record for evidence and inferences that support the challenged finding, considering evidence favorable to the finding if a reasonable factfinder could, and disregarding evidence contrary to the finding unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827-28 (Tex. 2005). We will not substitute our judgment for that of the factfinder if the evidence falls in the zone of reasonable disagreement. *Id*. at 822. We can reverse for factual insufficiency only if the finding is so contrary to the great weight of the evidence as to be clearly wrong and unjust and if the court erred harmfully when using that finding. *See Slicker v. Slicker*, 464 S.W.3d 850, 857–58 (Tex. App.—Dallas 2015, no pet.) (factual insufficiency); *see also Wheeling v. Wheeling*, 546 S.W.3d 216, 224 (Tex. App.—El Paso 2017, no pet.) (harm required).

**DISCUSSION**

Husband contends that the trial court (1) erred by failing to issue any findings of fact, conclusions of law, or ruling on the record after the trial; and abused its discretion (2) by failing to allocate the parties' debt; (3) by failing to consider that the marital property is in a floodplain; and (4) by deviating from the child-support guidelines to order Husband to pay the maximum standard child support based on insufficient evidence.

**I.     The trial court did not err by not filing findings of fact and conclusions of law because Husband's request for findings and conclusions was untimely.**

By his first issue, Husband contends that "the trial court failed to issue any findings of fact, conclusions of law or any ruling on the record following a two-day trial and the filing of post-trial motions." He asserts that "[o]nce the parties rested their cases, . . . the trial court announced that it would take the matter under advisement. Thereafter, there is no indication in the Clerk's Record that any ruling was ever issued by the judge." He notes that an email from court staff circulated to the parties' trial attorneys "purportedly containing the trial court's decision" but contends that the email was not an enforceable and appealable ruling. He also complains that the trial court did not make findings and conclusions and did not rule on his request for them or on his motion for new trial.

Husband's contention that the trial court failed to make "any ruling" on the divorce suit, the property division, or SAPCR issues, is meritless. The court signed a Final Decree of Divorce that dissolved the marriage, apportioned the marital estate, assigned possession of the child, imposed child support, and made several other rulings in its 44 pages with 19 pages of exhibits. The last substantive paragraph of the decree states:

> IT IS ORDERED AND DECREED that all relief requested in this case and not expressly granted is denied. This is a final judgment, for which let execution and all writs and processes necessary to enforce this judgment issue. This judgment finally disposes of all claims and all parties and is appealable.

Husband's broad argument that "there is no indication in the Clerk's Record that any ruling was ever issued by the judge" fails.

If Husband's complaint concerns only the lack of response to his request for findings and conclusions, it fails for different reasons. The trial court did not "fail" to file findings and conclusions because Husband's untimely request did not obligate it to do so. The trial court signed its judgment on June 6, 2023. Requests for findings of fact and conclusions of law must be filed no more than twenty days after the judgment is signed. Tex. R. Civ. P. 296. The twentieth day after the judgment was signed was Monday, June 26, 2023. Husband's Request for Findings of Fact and Conclusions of Law was filed June 30, 2023. Because the request was untimely, the trial court was not obligated to prepare findings and conclusions. *See Williams v. Kaufman*, 275 S.W.3d 637, 642 (Tex. App.—Beaumont 2009, no pet.).

Husband's complaint that the trial court did not expressly rule on his motion for new trial also does not show error. Texas Rule of Civil Procedure 329b(c) provides:

> In the event an original or amended motion for new trial or a motion to modify, correct or reform a judgment is not determined by written order signed within seventy-five days after the judgment was signed, it shall be considered overruled by operation of law on expiration of that period.

Husband's motion for new trial was overruled by operation of law on Monday, August 21, 2023. The trial court did not err by not expressly denying Husband's motion for new trial.

We overrule issue one.

**II.** **Husband has not shown that the trial court abused its discretion in dividing the marital estate.**

Husband raises two issues regarding the division of the marital estate that overlap. By his second issue, he asserts that "[a]ssuming for the sake of argument that the email provided from the staff attorney constitutes the trial court's ruling, the trial court abused its discretion in connection with the property division by failing to rule and allocate the Parties' debt." In his argument, he focuses on the failure to offset the value of assets awarded to Wife with a share of the loans from family members that enabled the asset purchase and improvement. Husband contends by his third issue that the trial court abused its discretion by failing to consider that the marital property is in a floodplain. We will consider what writing shows the court's ruling, discuss the property-valuation issue, then move to the marital-estate division issue.

**A. Omission of issues from a staff attorney's email does not show abuse of discretion by the court.**

We are unable to review the merits of Husband's complaint that the court abused its discretion in its staff attorney's email to the parties about the court's decree that omitted some issues. The email that Husband challenges is not in the clerk's record. The burden lies with the appellant to provide the reviewing court with an appellate record sufficient to illustrate its entitlement to reversal. *Christiansen v. Prezelski*, 782 S.W.2d 842, 843 (Tex. 1990) (per curiam). He does not assert that it was improperly omitted from the clerk's record. He attached a printout of the email to his brief, but it is not file-stamped by a court clerk. Though Husband's quotation from the email is not challenged, there is no record reference as required. *See* Tex. R. App. P. 38.1(g). We will review the trial court's exercise of its discretion through its signed and

filed Final Decree of Divorce, not an unfiled email from its staff attorney that is not as comprehensive as the final decree.

### B. Husband has not shown that the trial court failed to consider the effect on the value of the real estate of being in a floodplain.

The parties' experts disagreed on the value of the marital real estate, viewing the effect of its floodplain status and its commercial potential differently and counting different amounts of livable space in the house. The court set the value of the property at $996,084.14 with an undisclosed amount of a mortgage remaining.[1] A factfinder has discretion to set the property value at any amount between the range of values introduced into evidence. *Preston Rsrv., L.L.C. v. Compass Bank*, 373 S.W.3d 652, 668 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *State v. Huffstutler*, 871 S.W.2d 955, 959 (Tex. App.—Austin 1994, no writ). But a factfinder may not assess a value amount neither authorized nor supported by the evidence. *Preston*, 373 S.W.3d at 668. Husband contends that the trial court's choice of a value closer to Wife's expert's valuation shows that it failed to fully consider the property's floodplain status.

Husband's expert real-estate appraiser, Steven Adams, valued the property at $770,000, evenly split ($385,000) between the house and the shop. Adams testified that the property's value was reduced by up to 25% because about 80% of the property was in a 100-year floodplain. There is a creek on the property with a metal bridge giving access to a small shed. Husband produced pictures of a flood in 2015 that put six feet of water in the basement of the house; a previous owner testified that a pipe from the basement led to the creek and enabled flooding when the creek rose. Adams wrote his report in May 2021, then revisited the site

---

[1] The court awarded Wife "[t]he sum of Four Hundred Ninety-Eight Thousand, Forty Two Dollars, and 07 cents ($498,042.07) which is fifty percent (50%) of the appraised value of the marital residence located [] minus one-half (1/2) of the mortgage owing to BB&T."

9

shortly before trial in September 2022. He testified that the property was essentially unchanged during that time except that the bridge had been displaced by floodwaters. He testified that market prices rose 10% from May 2021 to May 2022, then fell 5% by September 2022.

Wife's expert, Susan Briggs, valued the property at $1,040,000 in November 2021. She valued the house portion at $630,000 and the shop portion at $410,000. She asserted that Adams undervalued the property because he did not consider the full added value of the enclosed garage; Adams testified that the enclosure of the garage with a bathroom and closet added $5,000 in value, while Briggs counted it as 511 extra square feet of living space adding over $120,000 in value. She contended that Adams incorrectly deducted from the house's value both for being in the floodplain and for having the basement flood, which she considered "double-dipping;" she estimated that it caused him to undervalue the property by 25%—an amount that if removed would bring his valuation to $962,500. Briggs said that the basement is not livable area and is essentially like a piered foundation. She conceded, however, that a potential buyer might look at the basement as an attractive feature of the home and that the prospect of floods would detract from the attraction to the property, reducing the number of potential residential buyers. She noted that the property is "not always flooding" in the context of a discussion of whether the creek added value to the property. Wife testified that they had "fix[ed] the house completely" and that there was no more flooding. Briggs touted the property's mixed-use and commercial development potential due to its location between the interstate and a toll road. She testified that neighborhood property values at the time of trial had increased by 25% from May 2021.

The difference between the valuations is largely in the house which is the highest-valued structure affected by flooding. There is a $25,000 gap between the experts' valuation of

10

the shop, but that difference could be due to market forces and the date of their evaluations. Adams testified to a $385,000 value and said that values increased by 10% over the year after his May 2021 evaluation. Briggs set the value at $410,000 in November 2021—a 6.5% increase over the six months between the evaluations. The house valuation difference is more significant at $385,000 (Adams) and $630,000 (Briggs). Part of that difference is due to how the appraisers valued the enclosure of the garage; Adams listed it as a $5,000 enhancement and Briggs set it at over $120,000. Another difference is the discount for the floodplain issue; Adams said he reduced value by up to 25%, while Briggs said she thought Adams deducted twice—once for the floodplain and once for the basement's flooding history. Their valuations were also somewhat aged in a time of market volatility. Adams testified to a 5% net increase in values since his evaluation, though he did not adjust his valuation. Briggs testified to a 25% increase in value from Adams's May 2021 valuation to the trial date, which would also increase her November 2021 valuation somewhat. If the court chose Briggs's November 2021 valuation, it implicitly found that the remaining mortgage amount was $43,915.86,[2] a value within the range of the parties' testimony of $30,000 (Wife's testified minimum) to $50,000 (Husband's testimony); if its calculations included the full $50,000 remaining mortgage testified to by Husband, it set a value of $1,046,084.14—an increase of 0.59% in a period of much larger market-value increases.

We cannot say that the trial court failed to consider the effect of the real estate being in the floodplain. The court's valuation, while different from Adams's opinion, was supported by evidence. We overrule issue three.

---

[2] This calculation is Briggs's valuation ($1,040,000), less the amount accorded each party ($498,042.07 * 2 = $996,084.14).

**C. The absence of express findings of fact and conclusions of law does not prevent analysis of the division of the debts.**

Husband contends that, "in light of the trial court abusing its discretion in failing to issue any finding as to the existence or amount of marital debt to offset the overall value of the marital estate, the property division was not right and just as between the Parties." Husband also contends that the trial court's disposition of the debt is not supported by the evidence. While the court was not obligated to make findings and conclusions about the marital debt, we will review whether the trial court abused its discretion in dividing the debt as part of the just-and-right division of the marital estate. *See Lynch v. Lynch*, 540 S.W.3d 107, 131 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (division of marital estate includes division of debts and liabilities incurred jointly by parties along with assets).

The absence of express findings makes Husband's task challenging. The burden to show that a trial court's error caused a manifestly unjust property division is a high one and more difficult when the record contains no findings as to the value of the estate assets. *Matter of Marriage of Rangel & Tovias-Rangel*, 580 S.W.3d 675, 683 (Tex. App.—Houston [14th Dist. 2019, no pet.). To determine whether the trial court divided the community estate in a just-and-right manner, we must have the trial court's findings on the value of those assets. *Id*. at 141. Without findings of fact, we do not know the basis for the division, the values assigned to the community assets, or the percentage of the marital estate that each party received. *Rangel*, 580 S.W.3d at 683.

"One who complains of the way the trial court divided the community property must be able to show from the evidence in the record that the overall division is so unjust and unfair as to constitute an abuse of discretion." *Gonzales v. Gonzales*, 704 S.W.3d 54, 82 (Tex.

12

App.—Austin 2024, no pet.). Because the standards for dividing a community estate involve the exercise of sound judgment, a trial court must be accorded much discretion in its decision. *Bradshaw v. Bradshaw*, 555 S.W.3d 539, 543 (Tex. 2018). We cannot merely reweigh the evidence. *Id*. The trial court is authorized to "order a division of the estate of the parties in a manner that the court deems just and right," Tex. Fam. Code § 7.001, and has "wide discretion" that should be disturbed only in the case of clear abuse, *Murff*, 615 S.W.2d at 698. "Every reasonable presumption should be resolved in favor of the proper exercise of discretion by the trial court in dividing the property of the parties." *Zieba v. Martin*, 928 S.W.2d 782, 791 (Tex. App.—Houston [14th Dist.] 1996, no writ).

The court awarded the car-repair business to Husband in addition to the real property on which the home and business sit. It distributed other property—including multiple vehicles and bank accounts—without evidence of their value or balances. Only the real property including the marital home and the car-repair shop was given a stated value—and that is as reduced by a mortgage of unspecified amount that husband was required to pay.[3] That reduction effectively accorded half of the remaining mortgage debt to Wife while leaving Husband responsible for its eventual repayment. The court also required the parties to pay debts they incurred solely, all payments due on real and personal property apportioned to them, and their own legal fees. The parties' unspecified credit card-debt was apportioned by assigning specific

---

[3] As noted above, the court awarded Wife "[t]he sum of Four Hundred Ninety-Eight Thousand, Forty Two Dollars, and 07 cents ($498,042.07) which is fifty percent (50%) of the appraised value of the marital residence located [] minus one-half (1/2) of the mortgage owing to BB&T."

13

cards to each spouse. Husband was required to pay all loans owed to Tran[4] Ly and all loans owed to family members. The trial court did not fail to rule and allocate the parties' debt, but did so without stating the amounts owed.

Husband asserts that the court abused its discretion because it allocated to him all of the $398,000 in loans used to purchase and improve marital property over the years. There is no detail in the decree regarding the amounts of the debts accorded the parties. The amount of the debts and Wife's knowledge of them are disputed. The parties agreed that they took out a $133,000 loan from Home Sweet Home and that Husband's brother lent them $60,000 in 2014 to purchase the property. Husband claimed $73,000 more in loans from his friends and family, but Wife said she knew nothing of those. Both spouses claimed that relatives wired them $215,000 in 2017 (Husband's sister and Wife's father); the couple's bank statements from February and April 2017 show receipt of wire transfers of roughly $215,000, but do not name the sending individual. Husband testified that he repaid his brother and his friend in 2015 after selling his separate-property house for $161,000. Wife denied Husband's claim that he used $161,000 from the sale of his separate-property house to pay for their community property.[5] She testified that, "since the day that we purchase[d] the house, we did not owe anybody money. We did not borrow anybody's money from anybody." She testified that the couple got a loan from Austin Telco to build the shop and that they still owe about $30,000 to $40,000 on that loan. Husband testified that at the time of trial they had a $50,000 mortgage with a $150 minimum monthly payment.

---

[4] The court reporter transcribed the name of Appellant's sister who loaned him money as Trang Ly.

[5] Husband does not seek reimbursement of his separate estate on appeal for this $161,000 sale.

14

Ultimately, the record does not compel or allow us to find an abuse of discretion on this issue. The court may have decided that neither party proved the amount of marital debt owed. It may have determined that it was just and right to accord debts to Husband that Wife did not know existed. It may have decided to allocate more debts to Husband than Wife because he was awarded the business and much of the debt was business-related. *See Sheshtawy v. Sheshtawy*, 150 S.W.3d 772, 780 (Tex. App—San Antonio 2004, pet. denied) (holding trial court did not abuse discretion by ordering one spouse to pay community debts incurred by that spouse for that spouse's business). It may have concluded that the award of the business and the car-repair shop and other assets balanced any imbalance in the distribution of debts. Because we conclude that Husband has not shown from the record that the overall division is so unjust and unfair as to constitute an abuse of discretion, we overrule issue two. *See Gonzales*, 704 S.W.3d at 82.

### III. The trial court abused its discretion in setting the amount of Husband's child-support obligation.

By his fourth issue, Husband contends that the trial court abused its discretion by deviating from the child-support guidelines to order Husband to pay the maximum standard child support under the guidelines based on insufficient evidence. In his substantive argument, he asserts that insufficient evidence supports the trial court's calculation of his net resources.

The award of child support is subject to an abuse-of-discretion standard that incorporates challenges to the sufficiency of the evidence as factors. *See Worford*, 801 S.W.2d at 109; *McGuire v. McGuire*, 4 S.W.3d 382, 384, 387 n.2 (Tex. App.—Houston [1st Dist.] 1999, no pet.). As Husband requests remand, he is challenging the factual sufficiency of the evidence. *See Scott Pelley P.C. v. Wynne*, 578 S.W.3d 694, 701 (Tex. App.—Dallas 2019, no pet.).

Texas Family Code Chapter 154 sets guidelines to apply in determining an equitable amount of child support. *See* Tex. Fam. Code. §§ 154.001–.309. The amount of child support is determined in part by the net resources of the obligor. *Id*. § 154.062(a). "Net resources" includes all wage and salary income, self-employment income, and all other income actually received. *Id*. § 154.062(b). The amount of those net resources that can be dedicated to child support under the guidelines is set by a percentage tied to the number of children to be served. *Id*. § 154.125. Application of the guidelines is rebuttably presumed to be in the child's best interest. *See id.* § 154.122. The court can depart from the guidelines for several reasons including age and needs of the child, possession arrangements, the debts assumed by a party, or any other best-interest consideration. *Id*. § 154.123. The guidelines for child support apply to a capped amount of the obligor's monthly net resources. *See id*. § 154.125(a). At the time of trial, that cap was $9,200. *See id*. § 154.125(a-1) (guideline cap set every six years); 44 Tex. Reg. 3559, 3559 (2019) (eff. Sept. 1, 2019 for six years). If the amount of child support ordered by the court varies from the amount computed by applying the percentage guidelines, the court must make specified findings "[w]ithout regard to Rules 296 through 299, Texas Rules of Civil Procedure" relating to findings of fact and conclusions of law. *See* Tex. Fam. Code § 154.130(a)(3), (b); *Omodele v. Adams*, No. 14-01-00999-CV, 2003 WL 133602, at *5 (Tex. App.—Houston [14th Dist.] Jan. 16, 2003, no pet.) (mem. op) (holding trial court abused discretion by deviating from guidelines without making findings required in section 154.130 even when findings not requested).

Husband had one dependent child, so the percentage of his monthly net resources to be allocated to child support under the guidelines was 20%. *See* Tex. Fam. Code § 154.125(b). Application of the guideline of 20% of monthly net resources to reach an award of

$1,840 in monthly child support requires an implicit finding that Husband had (at least) $9,200 in monthly net resources available, or $110,400 in annual net resources.[6] Alternatively, the trial court found a lesser amount of net resources but departed upward from the guidelines in calculating the child-support owed. Husband contends that the trial court erred by departing from the amount of support due under the guidelines based on his monthly income of $1,833.

We will examine the evidence supporting the trial court's implicit findings. To award the maximum support calculable under the guidelines, the trial court must have found that Husband's monthly net resources met or exceeded the statutory cap of $9,200.

Husband estimated his monthly net resources based on his income-tax returns that showed a significant reduction from his car-repair shop's gross receipts to his reported income. Husband contends that he had been unable to earn as much because of family difficulties, health concerns, and the pandemic. He did not testify about any income stream other than his car-repair business. He testified that, after his customers paid him, he had expenses like labor, parts, and software. His four years of income-tax returns showed subtractions from gross receipts items including advertising, contract labor, insurance, leased vehicles, utilities, cost of goods sold or supplies, depreciation, and other expenses. Cost of goods sold or supplies alone offset more than half of the gross receipts.[7] The returns showed the following:

---

[6] Where "x" is Husband's monthly net resources, $1,840 is the child-support award, and the guideline is 20% or .2, solving for x: $.2x = \$1840$, then $x = \$1,840/.2$, and $x = \$9,200$.

[7] The title of this category shifted from cost of goods sold to supplies in 2020.

| Year | Gross receipts | Profit |
|------|----------------|--------|
| 2018 | $201,279 | $21,872 |
| 2019 | $150,916 | $13,557 |
| 2020 | $199,297 | $17,254 |
| 2021 | $241,470 | $19,163 |

The average of gross receipts in these years was $198,240.50 and of profits was $17,961.50 per year, or $1,496.79 per month. Husband requested that his obligation be based on income of $1,833 per month. He calculated that, after allowable deductions, he had monthly net resources of $1,619.88. Applying the guideline rate of 20%, his monthly child-support obligation would be $323.98.

Wife asked for support based on the "wages shown on his tax returns that he submitted to the Court of over [$]200,000." Wife also testified that Husband had told her he had made $80,000 to $120,000 annually when working at a dealership; she asserted "that is why he has a lot more when he is working for himself."[8]

We conclude that the trial court abused its discretion in awarding the maximum child-support under the guidelines. If it found that Husband had less than $9,200 in monthly net resources but departed from the guidelines without making the findings required to justify the departure, it abused its discretion. *See* Tex. Fam. Code § 154.130(a)(3); *Omodele*, 2003 WL 133602, at *5. If it found that Husband had monthly net resources of at least $9,200, it abused its discretion because that finding is not supported by legally or factually sufficient evidence.

The record supports a finding that Husband's business had gross receipts of at least $150,000 in each year, but it does not support the idea that he had "wages" of over

---

[8] Husband testified that he stopped working for the dealership in 2007.

$200,000. Husband testified and the tax returns indicated that his gross receipts for his car-repair business were largely offset by the cost of parts, contract labor, software, depreciation, utilities, and other expenses. There is no evidence challenging the claimed expenses. His maximum self-reported profit or income in the four years of tax returns was $21,782. Wife's testimony that he reported "wages" of over $200,000 was based on and yet inconsistent with the tax returns which showed much lower net income. Her testimony regarding his pre-2008 income is speculative and does not account for offsets that would be incurred if he were to shut down his on-property business in favor of resuming employment at a dealership.

The trial court's implicit finding that Husband has net monthly resources of at least $9,200 is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). The insufficiency of the evidence makes the amount of the trial court's child-support award an abuse of discretion.

But the record does not allow us to render judgment on Husband's net resources and child-support obligation. The Family Code describes how to calculate net resources available for child support, describes the information the parties must furnish, and details how to establish self-employment income. *See* Tex. Fam. Code § 154.061-.068. The income-tax returns are not conclusive on appeal because income-tax regulations are distinct from the rules in the Family Code. *See Powell v. Swanson*, 893 S.W.2d 161, 163 (Tex. App.—Houston [1st Dist.] 1995, no writ). The Family Code expressly allows adjustments to self-employment income as reported to the Internal Revenue Service: "In its discretion, the court may exclude from self-employment income amounts allowable under federal income tax law as depreciation, tax credits, or any other business expenses shown by the evidence to be inappropriate in making the

19

determination of income available for the purpose of calculating child support." Tex. Fam. Code § 154.065(b). On the state of the record, we cannot render judgment on the amount of child support owed.

We sustain Husband's fourth issue and remand for a new trial on the child-support issue.

## CONCLUSION

We reverse the part of the decree setting the amount of Husband's child-support obligation and remand that issue for further proceedings. All other challenged parts of the decree are affirmed.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed in Part, Reversed and Remanded in Part

Filed:   September 19, 2025